ALBANY,
Jan. 1814.

PATRICK
v.
COM. INS. Co.

———※·❦·※———

PATRICK AND BROWN *against* THE COMMERCIAL INSURANCE COMPANY.

THIS was an action on a policy of insurance on the ship *Thomas Jefferson, Thomas Dinsmore* master, " at and from *New-York* to *Cadiz* and back again." The policy, dated the 28th of *November,* 1809, contained the following clause : " The assurers take no risk in port but sea risk." The cause was tried at the *New-York* sittings before Mr. Justice *Yates.*

The master deposed, that he sailed from *New-York* the 13th of *November,* 1809, and arrived at *Cadiz* the 12th of *January,* 1810. The ship, on account of certain articles on board, was obliged to perform *quarantine,* and was not released from it until the 8th of *February* following. The greater part of the cargo was sold soon after the arrival of the ship at *Cadiz,* but from tempestuous weather, and various other causes, and particularly on account of the difficulty of procuring lighters, the place then being besieged by the *French,* it was not wholly discharged ; she began to discharge as soon as a permit was obtained from the custom-house, and about one third of the bulk of the cargo was landed, when, on *Sunday,* the 4th of *March,* while the ship was safely moored in the harbour, a very heavy gale of wind commenced from the southwest, and continued until the 9th of the same month. On the 6th of *March* the ship parted her best bower, and on the 7th, at half past one A. M. parted all her moorings, and drove ashore, opposite the *Isle of Leon.* All the crew were on board during the storm, and every exertion made to save the vessel. On *Friday,* the 9th of *March,* at noon, the gale had in some degree abated, and at 9 P. M. some *French* soldiers, from a neighbouring *French* battery, came on board and

A vessel was insured from *New-York* to *Cadiz* and back, and the policy contained a clause that " the assurers took no risk *in port but sea risk.*" While the ship lay off the *Mole of Cadiz,* in *March,* 1810, she was forced from her moorings in a violent gale of wind, and driven on shore, east of *Trochedera* creek, opposite *Fort Puntales,* and near the forts there occupied by the *French* troops, where she lay above high-water mark, and as soon as the gale abated, was forcibly taken possession of by the *French* troops, and burnt. It was held that the word "*port,*" in the clause in the policy, was used in contradistinction to the *high*

seas, and was not confined to the port of departure or discharge, but referred to any port into which the vessel might of necessity enter during the voyage insured ; and, if it were otherwise, it would seem that the place where the ship was stranded was within the port of *Cadiz ;* that as the vessel, after she was so *stranded,* could not have been got off, unless at an expense exceeding half her value, if at all, it was a total loss by the perils of the sea.

set fire to the ship, and both vessel and cargo were entirely con-sumed. The master and the crew (except the mate and four seamen, who had gone in a boat to *Cadiz* to inform the consignee of the state of the vessel, and to obtain assistance) were taken prisoners and marched to *Seville*. The vessel was driven on shore at high water, when, on account of the continued violence of the storm, the water was sixteen feet higher than it had been known to be before. After the gale abated, she lay high and dry, near 200 yards above high-water mark, and was buried in mud and sand to within three streaks of her bends. The master believed she was bilged, though, from her situation, he could not ascertain the fact; but from the violence and manner of striking he thought that must be the case; and that she could not have been gotten off without taking her to pieces, or digging a canal down to the water, which, if it were practicable, would have cost more than the value of the ship. The place where the ship was driven ashore was nearly opposite *Fort Puntales*, and immediately adjoining the fortifications of the *French*, on *Trochedera* creek, being a beach (or, as some of the witnesses said, the *Trochedera* islands) on the opposite side of the *Bay of Cadiz*. The master said the place was not considered as part of the port of *Cadiz*, and was then held by a hostile power, and entirely out of the jurisdiction of *Cadiz*. Before the *French* besieged *Cadiz*, merchant ships used to lie along from *Cadiz* to *Puntales*, and the *Spanish* prison-ships used to lie above the latter place, but in consequence of the position taken by the *French*, they were moved nearer *Cadiz*. When the *Thomas Jefferson* arrived, the *Spanish*, *English*, and *Portuguese* ships of war lay before *Cadiz*, and the shipping were anchored within the ships of war, extending from *Puntales* to *Cadiz Point*, above a mile from the shore. The *Thomas Jefferson* lay nearly opposite the mole, or gates of *Cadiz*. Four ships of the line, one frigate, and two transports, and a number of *American* merchant ships, in all about thirty, were driven on shore in the same gale with the *Thomas Jefferson*. The wind was from S. W. to S. S. W. After the storm abated, the mate was sent on shore to the consignee, with a view to save some part of the cargo, but no exertions were made to get off the ship or save her, as it was deemed ut-terly impracticable.

Several witnesses were examined, and several depositions read at the trial. The mate stated that the ship had four anchors, a

halser, and part of a halser; that they lent one of the anchors, the kedge, and part of a halser, to a vessel called the *Mary*, after the storm began. Another witness said it was the stream anchor that was lent. The mate said the water was ten or twelve feet, and another witness, that it was six or eight feet higher than usual. The mate said the *Thomas Jefferson* was ashore between *Mata-gorda* and a fort built by the *French* on the east side of the creek; that she went on with great violence, striking forcibly, and thumping violently several times; that the ground where she struck was sand covered with mud; that she lay above 100 yards above high-water mark. He could not ascertain that the hull was injured; he did not think it possible to get her off with anchors and cables, though she might, perhaps, have been got off, after the cargo was discharged, by means of machinery. That she drew 7 feet water when in ballast, and about 12 feet when loaded. That she could not have been raised and floated by means of hogsheads, without 7 feet of water around her. Several witnesses thought she could not be got off, unless at an expense greater than her value. Some of them said the water round the vessel was two or three feet high, and that it was practicable to get her off at a small expense. Some of the witnesses also thought that the place where the ship stranded was within the harbour of *Cadiz*; others said that it was within the jurisdiction of *Port Royal*, which was then occupied by the *French*. It was also testified that all intercourse with *Troche-dera*, then in possession of the *French*, was prohibited by the *Spanish* government at *Cadiz*, on pain of death, and that this prohibition extended to *Americans* as well as *Spaniards*.

The judge charged the jury, that he did not think there was evidence of a want of seaworthiness arising from the loan of the anchor and cable to the *Mary*, but that it was a question for their determination. If they believed her seaworthy, the next question for their decision was, whether the loss happened in *port*. That if they believed that the loss did not happen in port, they should find for the plaintiffs; but if the loss did happen in port, the next question for their consideration would be, whether there was a total loss of the vessel, before the burning. That in their inquiry as to the practicability of getting the ship off, the jury should confine themselves to the practicability of doing it by ordinary means; that any extraordinary means by which she might have been got off, at an expense of more than

ALBANY, Jan. 1814.

PATRICK v. COM. INS. CO

half her value, were not to be taken into consideration. That if she could have been got off at an expense of less than half her value, they ought to find for the defendants; otherwise for the plaintiff. The jury found a verdict for the plaintiffs for a total loss.

A motion was made to set aside the verdict, and for a new trial, on the following grounds:

1. That the vessel was made *unseaworthy* by the loan of a cable and anchor to the *Mary*, and by leaving the long boat with the *Mary*.

2. That the loss was not *in port*.

3. That the vessel was lost by burning, and not by the perils of the sea.

4. That the judge admitted improper, and rejected proper, evidence.

5. That the verdict was against law and evidence.

The cause was argued by *Wells* and *D. B. Ogden*, for the defendants, and *Hoffman* and *T. A. Emmet*, for the plaintiffs; but as their arguments were principally confined to a critical examination of the evidence, and a discussion of the facts in the case, it is deemed unnecessary to state them. The counsel for the defendants cited *Peake's N. P.* 212. 12 *East*, 647. 9 *Johns. Rep.* 21. 6 *Mass. Rep.* 482. 13 *East*, 394. 1 *Taunt. Rep.* 516.

KENT, Ch. J. delivered the opinion of the court. 1. The question of seaworthiness ought not to be disturbed. The loan of a cable and small anchor to a neighbouring vessel in the harbour, was not a strong fact in support of the allegation, and the weight of evidence was in favour of the finding of the jury.

2. As the defendants, by the contract, were to take " no risk in port but sea risks," it became material to ascertain whether the loss happened *in port;* and on this point there seems to be no room for doubt. The place where the ship lay at anchor when the storm arose, and the place where she was subsequently stranded, were both of them equally in port. The words are general, *no risk in port*, and they do not refer to the port of departure or the port of discharge, in exclusion of all other ports into which the vessel might of necessity enter during the course of her voyage. The word *port* seems here to have been used in a general sense, as contradistinguished from the *high seas;*

and no good reason occurs why the term should be confined to the two ports mentioned in the policy, in opposition to its popular and grammatical meaning. The general risks assumed by the defendants equally apply to all ports into which the vessel would of necessity enter, and the limitation of that general risk ought to be equally coextensive. The loss, therefore, happened *in port*. If, however, the words of the policy were to be construed to refer to the port of discharge, and to none other, the weight of evidence is, that the port of *Cadiz* embraced the place where the ship was stranded. The position of the port of *Cadiz*, and the commercial privileges and jurisdiction of that port, are matters of general and public notoriety, and go strongly to show the fact, to which some of the witnesses attested, that the shore on which the ship was driven by the tempest, was part of the port.

3. The only important and serious question in the case is, whether the loss was or was not by *sea risk*. The case turns wholly upon this fact. The ship was *stranded* by the storm, and the place where she was stranded was, at the time it happened, though not at the time when the contract was made, out of the actual jurisdiction of the port and government of *Cadiz*, and under the actual jurisdiction of a foreign and hostile force. The vessel and cargo were destroyed by this force within 48 hours after the ship was stranded, and before any experiment was made to relieve her.

The question at the trial was, whether the ship was so disabled by the stranding, or was cast so far on shore, as not to be worth reclaiming, or to be incapable of recovery. It is well understood that stranding is not, *ipso facto*, a total loss. It may be, and it often is, followed by shipwreck, or becomes, by other means, a total loss; but it is not, of itself, a loss that will justify an abandonment. It is always, in such cases, a question of evidence, whether the stranding be attended with such circumstances as to produce a total loss, either because it is followed by shipwreck, or other destruction of the property, or because the vessel cannot be set afloat, or because she cannot be repaired at the place of the peril, for want of materials or workmen, &c. In this case it was submitted to the jury, upon the testimony, whether the vessel was so stranded that she could not have been got off at an expense of half her value. The jury have decided this point in the negative, and as there was a contrariety of evidence on the

ALBANY,
Jan. 1814.

PATRICK
v.
COM. INS. CO.

point, the court do not think proper to interfere with the verdict, although some of us are not perfectly satisfied that the weight of evidence warranted that conclusion.

The motion to set aside the verdict is denied.

Motion denied.