By the Court.—Curtis, J.
The defendants, by their policy, dated November 26, 1864, insured the plaintiffs, on account of whom it might concern, loss payable to them or order, on the bark Lindo, for the" voyage, “at and from Miramachi to a port in Cape Breton, and at, and thence to New York.”
By the policy, it was agreed, that in case of any *315 claim for loss or damage, a deduction of one-third from the cost of repairing or replacing the same should be made, after certain other deductions enumerated in the policy; also, that if a technical total loss be claimed, similar deductions should be made from the cost of the estimated repairs, and unless the net cost thereof would exceed a moiety of the value of the vessel after making such deductions, the loss should be deemed partial only. The plaintiff claimed for a total loss, but no actual abandonment was ever made. By the policy, it was also warranted that the vessel was commanded by a captain holding a certificate from the American Shipmasters’ Association.
. The defenses relied upon were, first, that at the time and place of the loss, the vessel was not covered by the policy ; second, that there was a breach of the warranty in respect to the captain, he not being shown to hold the certificate required by the policy; third, that a total loss was not proved, and that as a partial loss, no proof was given which would enable an adjustment to be made according to the terms of the policy.
The vessel sailed from Mirimachi, ¡November 24, 1864, and on the evening of the 25th passed the north cape of Cape Breton. It was a stormy coast, and at an inclement season of the year, the weather squally, with snow; and the captain, on the 26th, put into the port of Sydney, on Cape Breton, as a port of safety. Under the policy, he had a right to put into any ports and places, if obliged by stress of weather. The captain went by land to Big dace Bay, and also, on the same day, to Cow Bay, which is about twenty miles from Sydney. At the former place there was no wharf, and he could only load sixty or seventy tons a day, lying half a mile or more from the shore. At the latter, there was a wharf between three and four hundred feet long, and where he could load four hundred tons a day. Here he obtained a charter to take a cargo *316 of coal to Mew York. He remained until December 13 in Sydney harbor, awaiting his turn to load at Cow Bay, as appears to be the custom of vessels during the inclement season of the year, in consequence of the exposed and dangerous condition of both Big Grlace Bay and Cow Bay for vessels at that time taking in cargo.
Gfoing from Sydney to Cow Bay, she encountered very, rough weather, such as usually prevails there at that season, got blown off, and lost an anchor and a man. Arriving at Cow Bay, the Lindo anchored about one-eighth of a mile from the head of the wharf, where several small vessels were then still loading.
The next morning she commenced discharging ballast, but did not get into the wharf at Cow Bay until the evening of December 18. After she got into the wharf, she finished’discharging ballast, and commenced loading on the 19th, and took in about four hundred tons of coal, and kept on working all night until the morning of December 20.
The sea heaved, and knocked the vessel about, so that the captain could not keep her under the coal shoot for loading. ' He secured her to the wharf and held on there until nine o’clock in the morning, when she broke adrifhand went ashore, bilged and filled with water, and in about five minutes after, the mainmast and fore and mizzentopmast were all taken away. Indeed, in five minutes from the time she struck, he testifies, she was “a complete wreck.” Both boats were lost, and the captain and crew, being unable to get off, remained on the wreck for about thirty hours. At the time of the shipwreck, the loading of the vessel had nearly been completed, her full cargo being about six hundred ton's of coal. When she broke from the wharf, her new chain and hawser had parted, and some of the bits of the vessel had pulled out, two on the top-gallant forecastle, and two on the half-deck, and one on the quarter-deck. She had struck , her stern first *317 upon the reef, and the whole of the hulk of the vessel lay upon the rocks. At low tide there was about a foot of water under her stern, and about nine or ten feet under her bow.
On January 25, 1865, the plaintiff, acting on behalf of the owner, presented to the defendants a protest of the captain, first mate and carpenter, dated December 21, 1864 ; also a survey of the harbor master, merchant and captain, of like date, a copy of the ship’s register, accounts of sales, dated December 30, 1864, and January 2, 1865, and vouchers, and also a statement of the adjustment of salvage, dated January 25, 1865, and made claim for a total loss, crediting the defendants with a small amount of salvage. On the trial, these papers, together with affidavits of the captain, dated May 5, 1865, and May 20, 1865, and protest, dated April 5, 1865, were admitted by the court only as evidence of service of proofs of loss upon the defendant, but not as evidence in chief. There was evidence she was sold as a wreck, and realized the sum of nine hundred and fifty-three dollars and sixty-five cents, net proceeds.
It appears in evidence that after lying some. time on the rocks at Cow Bay she was got off, towed round to Sydney and repaired, but at what cost does not appear. She was restored, however, to a sound and seaworthy condition, and at the time of the trial (1870), and for a long time prior, she was in the hands of the plaintiffs (as consignees), and prosecuting voyages. It appears that in October, 1865, she was at Sydney; that in 1867 she sailed from Prince Edward Island for a port in England. In 1869, she was in New York, in good condition, arriving in July, consigned to the plaintiffs, and they then chartered her to Hughes & Co., and despatched her to Montevideo, which voyage she was prosecuting at the time of the trial.
*318 Plaintiffs having rested their case, the defendants’ counsel then moved to dismiss the complaint on the following grounds, among others.
1. Because the loss is not proved.
That total loss only is claimed. But there was no actual total loss, because the vessel was not destroyed. She remained as a ship notwithstanding the disaster, and she is proved to have been in 1869 in the port of New York, and to have been a strong, staunch and seaworthy vessel, belonging to a connection of the plaintiff, McColl, and managed by him.
Also that the plaintiffs cannot recover as for a technical total loss, because there was no abandonment to the underwriters, which is absolutely necessary to en able the assured to turn a loss, otherwise partial, into . a constructive or technical total loss, and because she is not proved to have been injured by the perils insured against to an amonnt exceeding half her value within the rule, and also because' the insured made no effort whatever to float and save the ship.
Nor can they recover the actual damage as a partial loss, because there is no proof of the amount of the same, and no verdict for any specific amount could stand.
They claim no partial loss, have presented no preliminary proofs of any partial loss, and should not be allowed to recover therefor.
Tne court denied the motion to dismiss, and defendants’ counsel excepted.
No evidence was offered on the part of the defendants.
The defendants’ counsel moved the court to direct a verdict for the defendants.
The motion was denied, and the defendants excepted.
The learned judge directed a verdict for the plaintiffs for thirteen thousand one hundred and fifty-four dollars and fifty cents.
*319 To which direction defendants’ counsel excepted.
The question arises whether, upon this state of facts, there was such proof of a total loss of the vessel as to justify a verdict against the underwriters. It is not only important for the protection both of owners and underwriters, but in the light of a matter of public policy, that these contracts for marine insurance should be liberally interpreted and divested of all that seems obscure and technical. This appears to be the policy of the courts in England and this country when called upon to interpret them. Though as a branch of law comparatively modern in its existence, certain principles have been long settled in its administration, which are deemed vital for the protection of all parties.
The plaintiffs must prove either an actual total loss, or else a constructive total loss. In examining to find the evidence of an actual total loss, the testimony of the captain seems to be all there is relating to that subject, in the case. He testifies to the stranding and filling of the vessel, the loss of spars and boats, and parting of the bitts, and the parting of chain and hawser. These disasters and losses do not of themselves show that she became a total loss. The captain testifies “in five minutes from the time she struck she was a complete wreck,” but he does not state facts that show it, or how he arrived at that conclusion. This portion of his statement is after all but an expression of opinion on his part, and it must be further weighed in connection with the plaintiff’s testimony, by which it undisputedly appears that she was got off, repaired, and for years after was a sound, seaworthy vessel, and for which they acted as consignees. Viewed in the light of these surroundings, the bare opinion of the captain that “she was a complete wreck,” unsupported by other proofs, does not establish that actual total loss of the vessel, that the law permits the underwriters to require to be proved clearly and fully for their protec *320 tion and as their right (King v. Hartford Ins. Co., 1 Conn. 421; Sewall v. U. S. Ins. Co., 11 Pick. 90; Peele v. Merchant Ins. Co., 3 Mas. 42; Wood v. Kembic Ins. Co:, 6 Mass. 479 ; Patrick v. Com. Ins. Co., 11 Johns. 13; King v. Middletown Ins. Co., 1 Conn. 201; Peele v. Suffolk Ins. Co., 7 Pick. 257).
If it was not an actual total loss then it is to be considered whether the verdict can be sustained as a constructive total loss. Here the plaintiffs encounter a difficulty upon the threshold. When the loss is total, and there is nothing to abandon, an abandonment is of little moment.
But a loss in itself partial, may, by the exercise of the assured’s right of abandonment, be converted into a constructive total loss, upon the idea that the underwriter thereby receives all the benefits of ultimate recovery and salvage, and that, as these thus inure to his' advantage, a constructive total loss is created by the abandonment (2 Parsons M. Ins. 152 ; 2 Phillips Ins. §§ 1490, 1535, 1536).
In the present case the necessary proof.to establish the right to abandon, and insist upon a constructive total loss, has not been introduced. The rule is settled that to authorize this, the cost, or the estimated cost of the repairs, must amount to more than half the value of the vessel when repaired (Sawiez v. Sun Mut. Ins. Co., 2 Sand. 482).
There is no evidence showing, 3r tending to show, what would have been, or was, the cost of repairing the vessel in question (Feedler v. N. Y. Ins. Co., 6 Duer, 282).
It is quite possible that there may be evidence, at a future trial, that will obviate these difficulties that now embarrass the plaintiffs’ case; but as it now appears, without considering the further questions raised by the defendants, the judgment and order appealed from should be reversed, with costs to the appellants to abide the event, and a new trial ordered.