KING *against* THE MIDDLETOWN INSURANCE COMPANY.

A ship was insured from *New-London* to *Wilmington* in *North-Carolina,* thence to one or two ports in *Ireland* or *England,* with liberty to go to *Lisbon,* and to touch and trade at *St. Ubes,* and back to her port of discharge in the *United States.*

THIS was an action on a policy of insurance in the usual form on the ship *Governour Griswold,* upon a voyage from *New-London* to *Wilmington* in *North-Carolina,* thence to one or two ports in *Ireland* or *England,* with liberty to go to *Lisbon,* and to touch and trade at *St. Ubes,* and back to her port of discharge in the *United States.* The plaintiff sought to recover as for a total loss.

The cause was tried at *Hartford, February* term 1814, before *Reeve,* Ch. J. and *Trumbull* and *Ingersoll,* Js. ; when a verdict was found for the plaintiff, as for a total loss.

The case as it appeared on the trial was as follows. The ship *Governour Griswold* sailed on her voyage from *New-*London to Wilmington, and from thence to *St. Ubes.* The ship having performed her outward voyage, took in a cargo of salt at *St. Ubes,* cleared out therefrom for *New-York,* arrived off *Montaug* point, sailed thence for *New-York,* and arrived there on the 21st of *June* in the evening. The supercargo wrote, the same evening, to the owner in *Hartford,* advising him of the arrival of the ship, and received an answer on the 25th, directing him to proceed immediately with the ship and cargo to *Middletown ;* the letter of the supercargo having been sent, and the answer returned, as soon as by the course of the mails was possible. On the 26th, the master, with the advice of the supercargo, took out of the ship about 3,000 bushels of salt, and put it into lighters for the purpose of lightening the ship so that she could get into *Connecticut* river. The ship and cargo were entered at the custom-house in *New-York,* and the duty paid on three boxes of lemons, being the only part of the cargo liable to pay duty ; but no part of the cargo was taken out except the salt which was put into lighters. The ship sailed from *New-York* with the first fair wind, which was on the 30th, for *Middletown ;* and in attempting to go through *Hurl-gate* on the first of *July,* she was thrown upon the rocks, her rudder and a great part of her keel were knocked off, one of her sides was beaten in so that the whole of the salt on board was washed out, and she was in extreme danger of being utterly lost. While she thus lay on the rocks, *viz.* on the 4th of *July,* the owner abandoned. The insurers refused to aid in getting her off, or in repairing her. She was got off on the 8th, and taken to *New-York,* where she was afterwards sold at vendue. Held, 1. that the going from *Montaug* point to *New-York* was not a deviation ; 2. that the clearing out for *New-York,* arrival there, payment of duty on the lemons there, waiting there for orders from the owner, and lightening the ship there, did not constitute *New-York* the port of discharge ; 3. that though the unlading of a part of the cargo in *New-York* would make that port the port of discharge, yet the lightening of the ship there was not an unlading ; 4. that the intention of the master to make *New-York* the port of discharge was immaterial ; 5. that the direction of the owner to the master to come from *New-York* to *Middletown* to discharge was reasonable ; 6. that at the time of abandonment there was a total loss ; and 7. that a subsequent purchase of the ship by the original owner, at an open and fair vendue, would be no waiver of the abandonment.

New-Haven,
November,
1814.

King
v.
The
Middletown
Insurance
Company.

*London* to *Wilmington*, thence to *Ireland*, and thence to *St. Ubes*, where she took in a cargo of salt, and cleared out therefrom for *New-York*. She arrived off *Montaug* point, and sailed thence for *New-York*, where she arrived on the 21st of *June* 1812, in the evening. The supercargo wrote to the owner in *Hartford*, advising him of his arrival in *New-York*, and put his letter into the post-office the same evening, which was carried to *Hartford* in the mail that left *New-York* the next day, and arrived at *Hartford* on the 23rd. He received an answer on the 25th, directing him to proceed immediately with the ship and cargo to *Middletown* on *Connecticut* river. This letter of the supercargo was sent, and the answer thereto returned, as soon as by the course of the mails was possible. The supercargo and captain then conferred together upon the expediency of lightening the ship in *New-York*, and determined to do it, considering it to be safer and better for all concerned to have her lightened at *New-York* than off the mouth of the river; it being agreed that she could not go into the river and up to *Middletown* without lightening. In consequence of this determination, they immediately engaged lighters; and the next day, the 26th, a little less than 3,000 bushels of salt was taken out of the ship, and put on board the lighters. The ship sailed with the first fair wind, which was on the 30th, for *Middletown*, having first taken a pilot on board. In attempting to go through *Hurl-gate* on the 1st of *July*, she was thrown upon the rocks, her rudder and a great part of her keel knocked off, and one of her sides beaten in so that by means thereof the whole of the salt on board of her was washed out and lost. The captain immediately wrote to the owner, and informed him of her condition; who thereupon immediately, *viz.* on the 4th of *July*, while she thus lay on the rocks, abandoned her to the defendants, so far as they were concerned by virtue of their insurance. The defendants neglected and refused to furnish any assistance for getting the ship off the rocks, or to defray the expenses of doing it; and they declared to the plaintiff that they would do nothing, as they considered their insurance upon the ship to have ended at *New-York*.

The ship was got off the rocks on the 8th, and taken down to *New-York*. She was afterwards sold there at vendue; and was purchased by *John King*, the plaintiff's brother.

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

The plaintiff afterwards agreed to take the purchase off his hands, and took the ship into his possession, and caused repairs to be made upon her; and she has ever since remained in his possession. But the plaintiff denied that *John King* had any authority to purchase the ship on his, the plaintiff's account; and contended that he purchased her altogether on his own account.

The usual entry was made at the custom-house in *New-York* of the ship and her cargo as at her port of discharge, after she arrived there, and before she sailed for *Middletown*; and the duty was then and there paid on three boxes of lemons, being the only part of the cargo liable to pay duty. But no part of the cargo was landed at *New-York*; nor was any part thereof taken out of the ship, except the salt which was put into lighters.

The voyage to *Middletown* by way of *New-York*, was more circuitous and hazardous than by *Montaug* point.

Upon these facts the defendants contended, that the court ought to instruct the jury, that the risk terminated at *New-York*. But the court decided otherwise, and gave the following charge to the jury. " This is an action brought on a policy of insurance to recover damages on account of an injury done to the ship at *Hurl-gate*, by the perils insured against in the policy. It is agreed, that the ship having sailed from *New-London*, was insured on her voyage to *Wilmington* in *North-Carolina*, and thence to one or two ports in *Ireland* or *England*, and thence to *St. Ubes*, and thence back to her port of discharge in the *United States*. It is also agreed, that she went this voyage to *Europe*, and cleared out for *New-York*, arrived there, and there made an entry. Immediately on the arrival, the supercargo wrote to the plaintiff notifying him of the arrival of the ship in *New-York*. This letter was written on the 21st of *June*, 1812, and reached the plaintiff on the 23rd; to which an answer was returned, which was received on the 25th, directing the ship to be brought into *Connecticut* river. The captain immediately lightened the ship in *New-York*, taking out nearly 3,000 bushels of salt, and proceeded on the 30th for *Connecticut* river; and in attempting to pass through *Hurl-gate*, was cast away on the rocks, by which means the damages complained of ensued.

" On this state of facts the defendants contend, that they

New-Haven,
November,
1814.

King
v.
The
Middletown
Insurance
Company.

are not liable for any damages; because the voyage, and of course, the risk, terminated at *New-York*, that being the port of discharge mentioned in the declaration. Whether it is so or not depends on the construction of the words of the policy, that is, what is meant by the term *port of discharge*. The court are of opinion that there is nothing in the facts stated that can constitute the port of *New-York* the port of discharge, and that the captain had a right to come to *New-York*, and there learn of the owner at what port the ship should discharge her lading, to which port he would have a right to go, unless the owner in his directions should act unreasonably.

" It is agreed that *Middletown* was the port at which the owner directed the ship to discharge. Whether this was reasonable or not is a question of law. The court are of opinion that this direction was reasonable.

" It has been urged that the delay at *New-York* was unreasonable, and by means thereof the risk was ended at *New-York*. If the facts before stated as to delay are not controverted, whether this was an unreasonable delay or not is a question of law. The court are of opinion that it was reasonable.

" It has also been contended, that it is in proof that it was the intention of the captain that *New-York* should be his port of discharge; and that such intention makes it so. This is a fact which it would be proper for you to find, if it was in point of law a material fact; but as it is wholly immaterial, you need not make any enquiry respecting it.

" It is further contended by the defendants, that the captain discharged a part of his cargo in *New-York*, and there landed it. This is a fact for you to determine. If he did, this would constitute *New-York* his port of discharge; there the voyage and risk terminated; and, of course, the defendants are discharged. But if you find no other discharge of the cargo than taking out the salt for the purpose of lightening the ship, and putting it into lighters, and the payment of the duty on the lemons; this is not in point of law such an unlading as will discharge the defendants. Of course, there must be a verdict for the plaintiff.

" In this case, the plaintiff contends that the loss is a total loss. The defendants contend, that the loss, if any that can be recovered, is only a partial loss. Where there is an utter

King
*v.*
The
Middletown
Insurance
Company.

destruction of the thing insured, the loss is total, and the insured can recover, whether he has abandoned or not. There are other cases where the loss is total, but by subsequent events it may be only partial ; as in the case of capture. There is, during the restraint by capture, a total loss ; but the ship may be recaptured or ransomed, and proceed upon the voyage. Thus a loss which was total becomes a partial loss. But if the assured abandon while the loss remains total, he has a right to recover as for a total loss. If he waits until subsequent events have rendered the loss partial, he cannot abandon, and can recover for a partial loss only. In the present case, the abandonment was made, as is agreed, while the ship lay on the rocks. The question then is, was it a total loss while she lay on the rocks ? If it was, then the plaintiff has a right to recover for a total loss, unless the defendants had defeated the effect of the abandonment by repairing the ship, or agreeing so to do. But this is not claimed ; but it is admitted, on the contrary, that they refused to do any thing on the ground that the risk terminated at *New-York.*

" It is contended in this case, that the plaintiff bid off the ship at vendue, and is now possessed of her, and that he has thereby waived his claim for a total loss. It is admitted, that the vendue was open and fair for all persons to bid. The plaintiff admits, that he is in possession of the ship, but denies that he bid her off, or authorized any person so to do. Whether he did or not is a question of fact, concerning which it would be proper for you to enquire, if it was material ; but you need not enquire ; for however that fact may be, the court are of opinion that the purchase is no waiver of the abandonment.

" If the injury is such as only to delay the voyage, and there is no extreme hazard of the loss of the ship, even though she is stranded, but under such circumstances that she may be got off without danger of sinking, or going to pieces, there is not a total loss at any time ; but if her situation is extremely hazardous, if she is in danger of being utterly destroyed, this is a total loss, and the insured having abandoned before she was got off, has a right to recover as for a total loss, unless the insurers will consent to be at the expense. Whether the situation of this ship was thus hazardous or not, is a fact for you, gentlemen, to determine.

If you find it was, your verdict will be for a total loss ; if not, it will be for a partial loss."

To this direction the defendants excepted, and moved for a new trial ; which motion was reserved for the advice of all the Judges.

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

The case was argued at the last term, by *T. S. Williams* and *C. Whittelsey,* and at this term, by *Dwight* and *T. S. Williams,* in support of the motion ; and by *Terry* and *J. Trumbull,* contra, in both instances.

In support of the motion it was contended,

1. That if *Middletown* was to be considered as the port of discharge, there was a deviation from the voyage insured. This ship made *Montaug* point on the 18th of *June,* reached *New-York* on the 21st, sailed for *Middletown* on the 30th, and was lost on the 1st of *July.* Here a period of twelve days elapsed ; whereas twelve hours would have carried her from *Montaug* point to *New-London,* or into the mouth of *Connecticut* river, in a direct course. *New-York* was neither in the direct, nor in the usual course to *Middletown.* The law of insurance requires that the ship shall proceed to her port of destination by the shortest and safest course. 1 *Marsh. Ins.* 183, 4. (*Condy's* edit.) *Reade* v. *The Commercial Insurance Company,* 3 *Johns. Rep.* 352. *Brazier* v. *Clapp,* 5 *Mass. Rep.* 1. If she calls at any port not specified, the policy is ended ; *Millar* 393. even if it be done with a view to land a cargo, *or for orders.* Per *Washington,* J. in *The Marine Insurance Company of Alexandria* v. *Tucker,* 3 *Cranch* 391. If there be several ports of discharge, the ship must not invert the order of them. 1 *Marsh. Ins.* 189. *Beatson* v. *Haworth,* 6 *Term. Rep.* 531. If the order be not particularly specified, they must be taken in their *geographical* order. 1 *Marsh. Ins.* 190. *Brown* v. *Vigne,* 12 *East* 283.

2. That *New-York* was the port of discharge, and there the risk ended. The term *port of discharge* is synonymous with *port of delivery,* or *port of destination. Camden* v. *Cowley, Millar* 399. *n.* S. C. 1 *Bla. Rep.* 417. *Brown* v. *Vigne,* 12 *East* 283. *Leigh* v. *Mather,* 1 *Esp.* 412. The port of discharge is the place where the goods are *intended* to be delivered. *Clason* v. *Simmonds,* cited 6 *Term Rep.* 533. In *Brown* v. *Vigne,* 12 *East* 288. *Le Blanc,* J. lays much stress

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

upon the fact that the master never contemplated going to any other port. In *Jarman* v. *Coape,* 2 *Campb.* 614. Lord *Ellenborough* held, that if it was the intention of the master to unlade the ship's cargo where the loss happened, she was to be considered as within the limits of her port of discharge. Suppose the plaintiff in this case had ordered the ship to discharge in *New-York,* and she had been lost after her arrival there, but before discharge begun; would the defendants be liable? That the master elected *New-York* as the port of discharge is evidenced by his having cleared out for that port, by his making entry there, and paying duty there. *Laws U. S. vol.* 4. *p.* 326. 331, 2, 3, 4. *sect.* 29. 32. 33. 34.

3. That the plaintiff had no right to abandon. That right exists only where there is an utter destruction of the property insured, or where the voyage is defeated. The stranding of a ship merely will not justify an abandonment. 2 *Marsh.* 582. *a.* *Wood* v. *The Lincoln and Kennebeck Insurance Company,* 6 *Mass. Rep.* 483, 4. A ship was driven by a field of ice on the rocks on the 19th of *November;* she could not be examined until *April* following, when she was found to be bilged, and much injured, but it was thought not irreparably so; in repairing her, difficulties arose from want of materials, and she was sold. Lord *Mansfield* decided this to be an average loss only. *Furneaux* v. *Bradley,* 2 *Marsh.* 584. Can it be said that the voyage was lost? The ship had reached the port in the *United States* for which she cleared; entry had been made; and a considerable part of the cargo had been taken out. In *Manning* v. *Newnham,* 2 *Marsh.* 586. the cargo could not be got home in the ship insured, or in any other. In *Alexander* v. *The Baltimore Insurance Company,* 4 *Cranch* 370. it was held, that the loss of the voyage as to the *cargo,* is not a loss of the voyage as to the *ship.* It will not be claimed, that there was a total loss in this case, on the ground that the damage exceeds half the value of the ship. But the court in their charge, say, " if the situation of the vessel is extremely hazardous, and she is in danger of being utterly lost," the insured may abandon. Was not the situation of the vessel in the case of *Furneaux* v. *Bradley* extremely hazardous? Was she not in danger of being utterly lost? Hazard alone, however extreme, can never constitute a loss. Hazard implies, *ex vi termini,* that the thing exposed is not lost. The ablest judges in *England* have

regretted that owners should ever be allowed to abandon where the property insured still exits. 1 *Term Rep.* 515, 516. 10 *East* 343.

4. That the purchase of the ship by the plaintiff was a waiver of the abandonment. *Saidler & Craig* v. *Church*, stated in 2 *Caines* 290. *Abbott* v. *Sebor*, 3 *Johns. Ca.* 39. *Ogden* v. *The New-York Fire Insurance Company*, 10 *Johns. Rep.* 177. In *Abbott* v. *Broome*, 1 *Caines* 292. 303. the principle of *Saidler & Church* v. *Craig*, was recognized, and the ground on which the cases were distinguished was, that in *Abbott* v. *Broome* the assured had done no act to affirm the purchase. In *Oliver* v. *The Newburyport Marine Insurance Company*, 3 *Mass. Rep.* 54. *Sewall*, J. said he would regard the substantial condition of the property for which an indemnity is claimed, rather than any formal changes of title. From the language generally used to describe the nature and effect of an abandonment, it is evident that in certain cases it *may be* waived. 10 *East* 341. 1 *Johns. Ca.* 152. 6 *Mass. Rep.* 482. 4 *Cranch* 45.

On the other side, it was argued,

1. As to there being a deviation. The ship left *St. Ubes* for *New-York*, and the first land made in the *United States* was *Montaug* point. There could, therefore, be no deviation in pursuing her voyage to her port of destination. To say that the ship deviated in going to *New-York*, assumes that *Middletown* had at that time been elected as the port of discharge; which is not claimed. The plaintiff insists, that he had a right to elect the port of discharge after the arrival of the ship in *New-York*; if so, it was no deviation to come to *New-York*.

2. Did the risk terminate at *New-York?* It is agreed that no part of the cargo was actually discharged at that place. If there had been an intention to discharge there, would it make any difference? The terms, " unlade," " deliver," " land," and " discharge" are used in the books as synonymous. *Laws U. S. vol.* 4. *p.* 321. 324. 6 *East* 204. And it cannot be pretended, that an intention to perform the act designated by either of those terms can be equivalent to the performance itself. If therefore the ship was not discharged of any part of her lading, this port was not necessarily her port of discharge. *Coolidge* v. *Gray*, 8 *Mass. Rep.* 527.

VOL. I.    25

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

*New-Haven,*
*November,*
*1814.*

King
*v.*
The
Middletown
Insurance
Company.

It is contended by the defendants, that *New-York* became the port of discharge because the ship was there entered, and because the duty on the lemons was there paid. But it will be found by examining the statutes of the *United States, vol.* 4. *p.* 326. 327. 380. that these acts were unavoidable; and therefore do not even prove an intention to discharge, much less are they a discharge itself.

Did the lightening of the ship in *New-York* constitute that her port of discharge? A ship is *lightened* that she may pursue her voyage. She is *discharged* when the voyage is ended. A breaking of bulk, when done for the purpose of discharging, is a beginning to discharge; but this frequently is done for different purposes, and is not then a beginning to discharge. *Kane* v. *The Columbian Insurance Company,* 2 *Johns. Rep.* 264. 272. The salt was not taken out of the ship to land, or that the ship might be discharged; but was put into boats or lighters, and these boats are, in legal construction, a part of the ship. *Sparrow* v. *Caruthers,* 2 *Stra.* 1236. *Hurry* v. *The Royal Exchange Assurance Company,* 2 *Bos. & Pull.* 430. *Parsons* v. *The Massachusetts Fire and Marine Insurance Company,* 6 *Mass. Rep.* 197. 208. In this case, lightening the ship was necessary; and the only question was as to the expediency of doing it at *New-York,* or at the mouth of *Connecticut* river. The captain in his discretion took out the salt at *New-York;* and this was a question proper for him to determine. 1 *Burr.* 348. *Doug.* 234. 5 *Mass. Rep.* 9. As the salt was taken out of the ship that it might be landed at *Middletown,* and as the boats are contemplated as part of the ship; the ship was not in reality discharged until it was landed at *Middletown.*

3. If the ship was protected by the policy at the time of the loss, the next enquiry is, whether the insured had a right to abandon? Upon the state of facts which then existed he had this right for two reasons; first, because the voyage was broken up; secondly, because the insurers refused to do any thing, or be at any expense, to get the ship off. *Millar* 284. 2 *Marsh.* 585, 6. 2 *Campb.* 624. *n. Abbott* v. *Broome,* 1 *Caines* 302. *Goold* v. *Shaw,* 1 *Johns. Ca.* 293. *Waldens* v. *The Phœnix Insurance Company,* 5 *Johns. Rep.* 310. 326. *Wood* v. *The Lincoln and Kennebeck Insurance Company,* 6 *Mass. Rep.* 479. 482.

4. Has the plaintiff by purchasing in the ship waived his

New-Haven,
November,
1814.

King
v.
The
Middletwon
Insurance
Company.

abandonment ? The effect of an abandonment is to transfer the property to the insurers. *The United Insurance Company* v. *Robinson*, 2 *Caines* 280. 284. *Waldens* v. *The Phœnix Insurance Company*, 5 *Johns. Rep.* 324. The law gives the insured, under certain circumstances, a right to abandon ; and when he exercises this right, the insurer cannot say that he will not accept. The transfer is complete without such acceptance. The ship having become the property of the insurers, it could not be revested in the insured without the agreement of both parties. Neither party by himself could vacate or waive the abandonment. In the *English* books there are many cases in which the insured had for a time the right to abandon, but not exercising it in season, he could afterwards recover only for a partial loss. *McMasters* v. *Shoolbred*, 1 *Esp.* 237. is a case of this description. But no *English* case can be found where an abandonment rightfully made is said to have been waived. In the cases decided in the state of *New-York*, two principal reasons are given why the original owner cannot purchase ; first, because he is agent and trustee of the insurer ; secondly, on account of the danger of fraud. The owner is never trustee unless he is also master ; for the master becomes immediately after abandonment the agent of the insurer. That principle, therefore, does not apply to the present case. And if the insurer can elect to take the vessel or not, as would seem from the same cases, it is difficult to perceive how he can be defrauded. It is admitted that the sale in this case was open and fair ; and no reason can be assigned why the original owner of the ship might not purchase her at vendue, if he was willing to give more than any other person.

In reply, it was said that the case of *Coolidge* v. *Gray*. which was principally relied on to shew that the risk did not terminate at *New-York*, was distinguishable from the present in several important particulars. 1. That vessel was *outward* bound ; this was *homeward*. The cargo of the outward bound vessel is to be disposed of abroad, and the avails brought back to the owner. A homeward bound vessel comes, of course, to the owner, unless otherwise particularly directed. In this case, the port of arrival was left to the discretion of the supercargo, and he fixed on *New-York*. Having exercised his discretion, the owner must be conclud-

King
*v.*
The
Middletown
Insurance
Company.

ed by it, and his powers were exhausted. 2. That vessel was bound *to a market;* this was bound *home.* *Rotterdam* was the object of the former. Could she have gone there, and had actually gone there, it would have been her port of discharge, as appears from the reasoning of the court. This vessel actually did reach her port of destination, *viz. New-York.* 3. That vessel was turned away from *Rotterdam by necessity.* Necessity alone justified her going elsewhere. Her right of departure for *Gottenburgh* rests altogether on this necessity. Is that the fact with this vessel? So far from it, she left *New-York* merely for the convenience of the owner, and by his voluntary orders. 4. That vessel left *Rotterdam* and went to *Gottenburgh* in pursuit of a market, where the cargo was to be sold for the owner. This vessel came home to the owner, her cargo was to be sold by him, or at his will. The supercargo did not go to *New-York* for a market, but for further orders. He could not sell there under any circumstances. All the powers he had over the voyage were exhausted on his arrival at *New-York.* In order to enable the ship to proceed further, new orders were necessary. The owner gave new orders; and in the execution of them, the loss happened.

It was also insisted, that no other case ever went the length of *Coolidge* v. *Gray;* and if the decision be law, it is only in that case, and others that are in substance like it. The principles of that decision cannot safely be extended.

REEVE, Ch. J. In this case it was contended by the defendants, that *New-York,* to which port the ship was cleared out, and to which she arrived, was her port of discharge; and, of course, the risks insured against there terminated. The plaintiff contended, that he had a right to clear out for one port in the *United States,* and when he had arrived there, to enquire where he could find the best market for his cargo, and to go thither; and when he had elected any port to which to go, that became his port of discharge.

*English* authorities as to this point were searched for in vain; but there is in the 8th volume of *Massachusetts* Reports(a) a case that cannot in point of principle be distinguished from the case before the court. In that case, a cargo was insured from *Boston* to her port of discharge in

(a) *Coolidge* & al. v. *Gray,* 8 *Mass. Rep.* 527.

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

*Europe.* In this case, the insurance was to certain ports in *Europe,* and back again to her port of discharge in the *United States.* If in this case the port of arrival in the *United States* was her port of discharge, and there the risk terminated ; then in the case referred to the port of arrival in *Europe* must have been the port of discharge of the ship so insured. In that case, the intention was to have gone to some port in *Holland.* The vessel arrived in the *Maese,* and would have gone to *Rotterdam ;* but hearing that she would be in danger of confiscation, if she went there, she left *Holland* and went to *Gottenburgh ;* and thence she sailed up the *Baltic* for some port for a market, and was captured by a *Danish* privateer, and condemned. It was urged in that case, as in this, that as she had arrived to a port in *Europe, viz. Gottenburgh,* this port was her port of discharge ; and, of course, the risk terminated there. But the court held that the insurer was liable ; and that her port of arrival was not her port of discharge. The court went upon the ground that it was reasonable that when a ship had arrived at one port, the owners should enquire into the state of the market in other places, and if they found a port at which their cargo would sell, they might go thither. This is, then, an authority in point, that the port of arrival is not of course the port of discharge ; for if it was, *Gottenburgh* must have been the port of discharge ; and if it was, the risk there terminated.

In what does this policy differ from that ? It was said, that was to a port of discharge in a foreign land, while this is to a port of discharge in the *United States.* Can it be contended, that this makes a difference in point of principle ? Why did the court judge it to be reasonable that the risk in that case should continue after sailing from the port of arrival ? It was, as they tell us, that the owners, or their agents, might have a reasonable time to enquire into the state of the markets in the country to which they went, and not be driven to sell their cargo at a market which might be already glutted with the articles of which the cargo consisted. Does not the same reason exist when a vessel is sent from this country to *Europe* to bring thence a cargo to this ? How are the agents of the owners of the cargo to know the state of the market at the various ports here until they arrive in this country ? The constant fluctuation of the

*New-Haven*,
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

mark et in commercial countries is such that it is not impossible but that the port which afforded the best market for such articles as constitute the cargo when they left the country, may afford the worst on their return.

Since then, there is a decision in point in a sister state, by an enlightened court, and not *scintilla juris* to be found in any book of any country to the contrary, why was it not proper that the court should be governed by such decision? If it was, in the view of the court, an unreasonable decision, or opposed in its principle to analogous cases, the court would have decided otherwise.

Let us then enquire, is not such a construction of the policy most reasonable? It is undoubtedly the interest of every commercial country to afford to commerce the most prompt protection, and every reasonable facility. Would it not often prove detrimental to commerce, to compel the insured, when insured to a port of discharge, to elect that port in a foreign land, when they clear out for their homeward voyage, without understanding what the market is in the various ports of that country to which they are bound; so that when they arrive at the port for which they cleared out, they must discharge the cargo there, or run the risk of part of the voyage until they come to a good market? It will often happen, that when they arrive, the market is glutted; but in one day's sail the market is good. Why should the insured be obliged to run the risk of loss, if they go thither, when it is manifest it was the intention of the parties, that the policy should cover the risks insured against until the vessel should arrive at the port of actual discharge? If the port of arrival is in point of law the port of discharge, it is *technically* so; and it cannot be supposed that the parties so intended. If the parties had intended that the risk should cease on the arrival of the vessel in any port of the *United States*, they would have so declared in the policy, or the insurance would have been on her until she arrived in some port. If the port of arrival is of course the port of discharge, being one and the same thing, the argument is with the defendants; and in that case, the agents of the owners will be obliged to select their port of discharge, when in a foreign country, without any means of knowing the state of the market to which they are going. This appears to me unreasonable. But if the port of discharge may mean a different port from the port of

New-Haven,
November,
1814.

King
v.
The
Middletown
Insurance
Company.

arrival, then to such different port is the vessel insured; and the risk does not terminate upon her arrival at any port. And this appears most reasonable, that the agents of the insured may be able to learn upon their arrival in the *United States* at what port they can sell their cargo to the greatest advantage, and thus sail to their port of discharge protected by the policy. If by port of discharge we may conclude that the parties meant where the vessel should unlade, on what principle could the court be justified in saying that they meant where the vessel should first arrive? This the court could never say, unless port of arrival and port of discharge are synonymous terms. They certainly are not so used in common parlance; and in no book can we find that in a legal sense they mean one and the same thing. We are, therefore, bound to understand them in a policy of insurance as the terms naturally import.

It was further contended by the defendants, that on the hypothesis of the owners, or their agents, having a power after their arrival at *New-York* to elect another port as a port of discharge, they should have done it sooner. It is inconceivable how there could have been greater expedition; for immediately on the arrival of the vessel, the supercargo wrote to the owner to learn to what port he should go. The owner, on the receipt of his letter, wrote to the supercargo to come to *Middletown.* The time from the arrival to the receipt of the letter from the owner directing him to come to *Middletown,* was but five days, including the day of arrival, and also the day on which the owner's letter to the supercargo was received; which was as soon as it could be done according to the course of the mail. Whether there had been any unreasonable delay being a question of law, the court was of opinion that there was none.

It was further urged, that the vessel delayed sailing from *New-York* an unreasonable time. The facts stated in the motion, and which were agreed to, are, that the vessel, on the receipt of the directions of the owner to come to *Middletown,* was immediately lightened of 3000 bushels of salt, which was put into lighters that the vessel might go into *Connecticut* river more safely, it being agreed that she could not get into the river unless she was lightened; and that she sailed the first fair wind for *Middletown,* which was, as appears from the statement agreed to, the fifth day after the

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

directions to come to *Middletown.* It was agreed, that she took a pilot on board. This being also a question of law, the court was of opinion that there was no unnecessary delay.

It was also contended by the defendants, that this case in point of fact differed from that reported in the 8th of *Massachusetts* reports in this, that this vessel broke bulk in *New-York,* but the vessel at *Gottenburgh* did not. This was a fact left to the jury by the court's directing them, if they found that bulk had been broken at *New-York,* to find for the defendants ; for this would have made the port of *New-York* her port of discharge ; charging them, however, if they found no other breaking of bulk than putting the salt into lighters, that this was not in point of law breaking of bulk. This fact the jury found against the defendants. It was never claimed that the salt was landed in *New-York.* It was admitted, that the vessel must be lightened somewhere ; and that it might be done with more safety in *New-York* than in the sound off *Connecticut* river. I can perceive no ground on which this transaction can be called a breaking of bulk in *New-York.*

It was also urged, that the vessel made the common entry in *New-York,* and paid the duty on three boxes of lemons ; but there was no pretence that any of the cargo or lemons were there landed. This she must have done as a matter of course when she arrived at *New-York,* whatever port might have been her port of discharge. Surely, no man will contend, that the port at which a vessel may happen to arrive where the owners are bound to make entry and pay duties, is of course the port of discharge of the vessel, unless the owners do some voluntary act making it a port of discharge.

It was also urged, that it was the intention of the captain to make *New-York* his port of discharge. The court charged the jury that it was immaterial whether the captain intended to make it a port of discharge or not. It is taking very rank ground to say, that if a captain should once intend that a certain port should be his port of discharge, he never can, be his information what it may, change that intention. He might have thought that *New-York* was the best market when he cleared out, and have intended to go there, and there discharge his cargo ; but learning that *Middletown* was a better market, might he not have gone there directly ? The answer can be no other than that he might have so done.

New-Haven,
November,
1814.
⌣
King
v.
The
Middletown
Insurance
Company.

Would the port of *New-York* be his port of discharge in such case? It cannot be pretended. No intention in the captain to make a certain port a port of discharge can preclude him from changing his opinion, and making some other port his port of discharge. If any thing makes *New-York* in this case the port of discharge, it is because the vessel arrived there, and that a port of arrival and a port of discharge are one and the same thing; which is directly opposed to the case cited from the *Massachusetts* Reports, not supported by any law of any country. The adoption of such a construction would be detrimental to the interests of a commercial country, and imposing an unreasonable hardship on the owners of vessels, compelling them to make their election of their ports of discharge without knowing the state of the market, or when they had learned, compelling them to go to market, there to discharge their cargoes at their own risk, when it is most apparent from the policy that the parties intended that the risk should rest upon the insurers until the vessel arrived at the port where she was to discharge her cargo.

It was also contended, that if *Middletown* was the port of discharge, there has been a deviation, which discharges the insurers; for the vessel arrived off *Montaug* point, and thence sailed to *New-York*, which was a very indirect course for *Middletown*. It must be apparent to every person, that this must wholly depend on the question that has been already considered; for if she had a right to go to *New-York*, the port to which she had cleared out, and there elect her port of discharge, there can be no deviation. For when she arrived at *Montaug* point, *Middletown* was not her port of discharge, but became so after her arrival at *New-York*. She was cleared out for *New-York*, and when on her voyage, without intending it, fell to the eastward of that port. It was then proper that she should go to *New-York*, which she did; and it is not pretended but that she went in the most direct course. If she had been insured to *Middletown*, and had arrived at *Montaug* point, and thence had gone to *New-York*, and had then sailed for *Middletown*, and had been lost, it would have been a deviation. But to make it a deviation in this case, *Middletown* must have been her port of discharge at the time she arrived off *Montaug* point. But this could not be, if there could be an election in *New-York* to

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

make her port of discharge; for it was not her port of discharge, until such election was made. The case is brought back to the doctrine held in the 8th of *Massachusetts* Reports, *viz.* that where there is an insurance to a port of discharge in *Europe,* the vessel may go to one port in *Europe,* and there make her election of her port of discharge; and that the port first arrived at is not her port of discharge, unless she makes it so by breaking bulk; and if she sails from such port in quest of a market, and is captured, the insurer is liable. This is an insurance of a vessel to her port in the *United States,* and, according to the doctrine of that case, can go to any port in the *United States,* and there make her election of her port of discharge, and if on her voyage to such port she is lost, the insurer continues liable.

It is admitted, that there has been a loss. It follows of course, if the doctrine I contend for be well founded, that there must be a verdict for the plaintiff. But the defendants contended, that admitting there was a loss, still it was only a partial loss; whilst the plaintiff contended that it was a total loss.

Where there is an utter destruction of the thing insured, the plaintiff can recover for a total loss, whether he abandons or not. But there are cases where the law views the loss as a total one, when in fact there is not an entire destruction of the thing insured; and in these cases the insured may abandon to the insurers what is not lost, and then recover as for a total loss. The idea of abandoning implies in it that there is something to abandon. In the present case, if the plaintiff is entitled to recover as for a total loss, it is this technical total loss; for it is admitted that he did abandon the vessel to the insurers. What is such total loss the books abundantly teach us; and we find a variety of cases in which the loss would be considered as total, if the insured had abandoned, whilst the loss was thus technically total; but not having abandoned until it became a partial loss, the recovery must be for a partial loss only. Where a vessel is captured, if this comes to the knowledge of the insured, he may abandon; and although the vessel escapes, or is recaptured, yet the insured can recover as for a total loss. But if the insured had waited until the vessel had escaped, or had been recaptured, before he abandoned, he could not have turned this partial into a total loss.

It being admitted, as before stated, that the plaintiff did

abandon, the enquiry will be, was there a total technical loss at the time of abandonment? It is admitted that the abandonment was made at the time the vessel lay upon the rocks. It is agreed that her rudder, and a great part of her keel were knocked off, and her sides beaten in, so that the whole of the salt on board was washed out and lost. And it was agreed that the defendants refused to be at any expense in getting her off, or in repairing her, claiming that the risk was at an end. Under these circumstances, the court charged the jury, that if the injury was such as only to delay the voyage, and there was no extreme hazard of her loss, even if she was stranded, but under such circumstances that she might be got off without danger of sinking, or going to pieces, this would not be a total loss at any time. But if her situation was extremely hazardous, and she was in danger of being utterly lost, this would be a total loss; and the insured having abandoned before she was got off, had a right to recover as for a total loss, unless the insurers would have consented to bear the expense of getting her off and of repairing her. With these facts the case was left to the jury under a direction, that if they found the vessel thus hazardously situated, the verdict must be for a total loss; if not so situated, the verdict must be for a partial loss only.

The charge on this ground, I apprehend, is perfectly correct. In the case of *Milles* v. *Fletcher, Doug.* 233. the rule is laid down by Lord *Mansfield*, that in every case where the voyage is lost, or not worth pursuing; or where the thing insured is so damaged as to be of little value to the owner, and where what is saved is worth less than the freight; and also, which particularly applies to the present case, where further expense is necessary, and the insurer will not undertake at all events to pay that expense; the insured may abandon, and recover as for a total loss. In this case, there was an absolute refusal to pay any expense; and the verdict of the jury found the extremely hazardous situation of the vessel at the time of the abandonment.

The doctrine here laid down is abundantly established in the case of *Goss* v. *Withers,* 2 *Burr.* 683. It is laid down in 2 *Marsh. on Insur.* 488. 583. (*Condy's* edit.) that where stranding is followed by shipwreck, so as to render the ship incapable of prosecuting her voyage, the insured may abandon. The same doctrine is taught by *Emerigon*, tom. 2. p. 180.

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

New-Haven,
November,
1814.

King
v.
The
Middletown
Insurance
Company.

In this case, the vessel could not prosecute her voyage. It was completely defeated, and the cargo washed into the sea. And wherever the voyage is lost, let the cause be what it will, it is a total loss of ship and freight, if the abandonment be made whilst the loss remains total. *Park* 119.

In this case, the abandonment was made whilst the vessel was ship-wrecked on the rocks, before she was got off.

The abandoment must also be made as soon as the insured has learned that there is a total loss ; and he must give the insured notice of his intention to abandon in a reasonable time after the intelligence arrives ; which was done in the case before the court. This doctrine is established in the case of *Mitchell* v. *Edie,* 1 *Term Rep.* 608. *Park* 172.

It is admitted in this case, that the plaintiff is in possession of the vessel ; that after she was got off the rocks, she was taken down to *New-York,* and there sold at public auction. It is not pretended that any unfairness was practised in the sale. She was purchased by a brother of the plaintiff, and by him transferred to the plaintiff. The defendants contended, that this purchase so made by the plaintiff's brother, was for and on the account of the plaintiff ; and that this transaction was a waiver of the abandonment before made. The plaintiff denied that his brother purchased the vessel on his account. The court charged the jury, that they need not enquire whether the purchase was on the plaintiff's account or not, for it was immaterial ; for if she was so purchased on the plaintiff's account, it was no waiver of the abandonment.

When we attend to the nature of an abandonment, this will shew that the purchase in *New-York,* if it had been made by the plaintiff himself, could not have made the purchase a waiver of the abandonment ; for the effect of an abandonment, is a transfer of the property abandoned to the insurers ; and the insured cannot by his own act revest himself with the property abandoned. No bill of sale could more completely transfer the property to the insured than is done by abandonment. If the insured wishes to waive his abandonment there must be the mutual consent of insurer and insured. If the plaintiff, whilst the vessel was on the rocks, had conveyed her by a bill of sale to the defendants, and they had accepted the conveyance, and given their note of hand for the purchase money, and having got her off

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

the rocks, had brought her to *New-York*, and there sold her at auction, and the plaintiff had there purchased her ; it might have been said in this case, that this transaction had annulled the purchase, and that the defendants were discharged from paying their note, with as much propriety as it can be said in the case before the court, that the purchase of the vessel by the plaintiff had annulled the abandonment. Nothing can be more absurd than to suppose that the plaintiff, after having transferred the property of the ship to the defendants, could, without their consent, set aside the transfer. This would place in the hands of the insured an advantage that would be most unreasonable. And the law is such as will shew us that such an idea is wholly inadmissible : as where there was an abandonment by reason of capture by the *Spaniards,* which capture rendered it a total loss, and the abandonment vested the property in the insurers. This loss was afterwards made up by government. The insured would have waived the abandonment ; but they could not ; for the right to the bounty of government was vested in the insurers. So when after abandonment, through a succession of unexpected events, a profitable voyage is made, the insurer reaps the whole of the profit ; and it cannot be otherwise, for the property abandoned became the insurer's. *Randal* v. *Cockran,* 1 *Ves.* 98.

To suppose (as has been urged) that to give effect to an abandonment, it must be accepted by the insurer, or in other words, that there can be no abandonment except where there is a contract between the insured and insurer that there shall be one, is to defeat the thing itself. This idea is wholly opposed to every case of abandonment. If it were admitted, in all the litigated cases whether there was an abandonment or not, or whether there was a right to abandon, the insurer would have had nothing to do but to shew that he never agreed to it. But this is never done in any case. The language of the books is utterly inconsistent with such an idea. It would be absurd to speak of the right of the insured to abandon, if there was no right but what depended on contract.

But it is said, that such language is to be found in the elementary writers. It is true, *Pothier* and *Valens* have both adopted the language of giving effect to an abandonment, if accepted by the insurer. However learned these authors

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

may be, and however useful to the jurist, they are not books of authority in the *English* courts, or in our courts; nor can there be found, as I apprehend, such an idea in any of our reporters. And this doctrine is denied to have any foundation in truth by *Emerigon,* tom. 2. p. 197.; and it is there stated, that an abandonment made on sufficient ground is irrevocable.

It follows, then, that this vessel was the property of the insurers from the time of the abandonment; and when sold in *New-York,* was sold by their agents, and for their benefit; for by law, as soon as the abandonment was fairly made, the captain and crew were no longer agents for, or in the employ of, the insured, but became the agents of the insurers. The vessel was sold at a fair sale, and for as full a price as she would fetch in market; and the plaintiff, if he bought her, must pay the purchase money. And there is no more reason in saying, that the plaintiff by the purchase having got her into his possession, he shall not recover the full value in an action on the policy, than there would be to say, if *A.* sells to *B.* an article of property for 100 dollars, and *B.* gives to *A.* his note of hand therefor, and then sells it again at auction or private sale, and *A.* is the purchaser for 50 dollars, that since *A.* has got the article sold into his possession, *B.* ought not to pay the full value expressed in his note.

If it could be said, that after the abandonment by the plaintiff, he had continued the captain and crew at his expense to get her off the rocks, and had succeeded, and had proceeded to *New-York* with her, and had there repaired her, and no objection was made to this by the insurer; it might be urged with some appearance of plausibility, that by consent of both insurer and insured, the abandonment was waived and given up; for although it is not true, that it is in the power of either party to prevent the effect which an abandonment has of vesting the property in the insurer, yet both parties may agree to waive it. But no such inference can be drawn in the present case; for immediately on the abandonment, the captain and crew became agents of the insurer, and whatever they did, in the view of the law, was done for the insurers, unless the contrary appears, *viz.* that they were continued by the insured in their employment.

It often happens, that the captain and crew know not for whom they are agents. The law has made it their duty to

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

do all in their power to save the property; and whatever is done is for those who at the time are owners. It may become necessary that the ship and cargo should be sold. This the captain has an implied power to do by the mercantile law; and by that law he is agent for the owner, whoever he may be, whether insurer or insured. In the present case, whoever carried this vessel to *New-York,* and sold her there, were agents of the insurers, unless the contrary appears. But there is no pretence that any thing was done by the directions of the plaintiff. It was, of course, done for the benefit of the insurers, and by those who in point of law are their agents. The law implies this, whether the insurers had, or had not, given any directions as to what was done.

When we consider the nature of an abandonment, and the effect it has upon the property abandoned, and the law merchant as it respects those who are on board of a vessel which is abandoned, that is to say, whose agents they are, it seems to me that the conclusion is irresistible, that the purchase of the vessel by the plaintiff has not turned that which was a total into a partial loss.

It is contended by the defendants, that there is a case(*a*) in the 10th volume of *Johnson's* Reports in point against the plaintiff. If this case should be found to be opposed to the plaintiff's claim, as is contended by the defendants, I should consider a decision in that commercial state, by a court so highly respectable, and respecting a subject to which their attention is so often called, of very high authority. But by a careful attention to that case as reported, and the principles there avowed, we shall find that it is in nothing opposed to the opinion of the court in this case, but on the contrary corroborates it. This was a case of *assumpsit* on two policies, one on the ship, and the other on the freight. The vessel was detained under an embargo of the *United States,* and by the plaintiff abandoned for a total loss; which the plaintiff could do; for at the time of the abandonment the loss was total. The abandonment was made on the 20th of *April* 1812. The defendants took no steps with respect to her. The plaintiffs, on the 2nd of *July* 1812, gave notice to the defendants, that unless they paid the plaintiffs as for a total loss, they should cause the cargo to be discharged, and the

(*a*) *Ogden & al.* v. *The New-York Fire Insurance Company,* 10 *Johns. Rep.* 177.

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

vessel to be sold for the benefit of whom it might concern. The plaintiffs having received no communication from the defendants, did sell her on the 23rd of *July,* the time which they mentioned in their notice for the sale. All this by the law merchant the plaintiffs might do ; and doing it, they were agents and trustees for the defendants. She was purchased by one *Stynets* for the plaintiffs, by their authority and direction, for 6,300 dollars. But this they could not do ; for a trustee cannot be both buyer and seller. The plaintiffs having thus got the vessel into their hands, immediately chartered her to one *Bulkley* for a voyage from *Charleston* to *Cadiz.* By the charter-party the freight was made payable to the plaintiffs. The ship's papers were not changed, but remained as they were at the time that the insurance was effected. In this case, the court held that the plaintiffs could not recover as for a total loss.

It is said, this is the case before the court. But there is a marked and essential difference in the cases. In the case before the court, the plaintiff had nothing to do with the sale of the vessel. She was brought to *New-York,* and sold by those who were the defendants' agents, without any interference by him, and by those to whom he had no relation, it having ceased by the abandonment. The defendants themselves, in the view of the law, brought their own vessel into market, and sold her for their own benefit.

It is true, the plaintiff might have given notice to the defendants, that he would sell her, if they would do nothing in the business, as was done in the case of *Ogden* v. *The Fire Insurance Company.* The law merchant permits this to be done ; and he might proceed to sell her ; but all that he does is as trustee to the insurers ; and if he sells to himself, he cannot avail himself of this sale as a *bona fide* purchase, on the principle before mentioned that a trustee can never be both seller and buyer. If the plaintiff in the case before the court had thus done, being both seller and buyer, it would have been the same case as the case cited from *Johnson,* except that the plaintiff has never employed the vessel as the plaintiffs in that case did.

The court in the case in *Johnson* say, if the original owner of a vessel is reduced to the necessity of selling her, if he perseveres in his claim for a total loss, he must surrender to the insurers the benefit of the sale. Nothing can be more

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

reasonable ; for in that case, the owner is by law a trustee for the insurer, and sells for him. If he purchases for himself, he cannot hold the property against the will of the insurer ; for the law has not vested him with power to sell to himself, but to others. But if he does sell to himself, as in the case referred to in *Johnson*, and the insurer does nothing to annul the sale, it is a waiver of the effect of the abandonment by both parties. It is an implied contract by both, that it shall be given up.

In the case of *Ogden* v. *The Fire Insurance Company*, and several others decided in the state of *New-York*, particularly that of *Saidler & Craig* v. *Church*,(a) there was not only a purchase by the original owner, the plaintiff, but an employment by him, which furnished complete evidence that it was a purchase for himself when acting in character of trustee for the defendant. None of these circumstances exist in the case before the court.

It is not sufficient to bring a case within the principle of *Ogden* v. *The Fire Insurance Company*, that the original owner was the purchaser. He must also be the seller ; and if a seller, he never can, in character of trustee, be the buyer. If then he sells and buys on his own account, and, in consequence thereof, takes possession, he waives the abandonment ; and if the insurer does nothing to prevent him from the enjoyment of the vessel, he also waives his title which accrued to him by the abandonment ; and the case is the same as if the original owner had, without any sale or purchase, taken possession of the vessel as his own, and employed her as his own, to which the insured had interposed no objection. This would have been a giving up of the effect of an abandonment by both parties. A sale and purchase by a trustee gives no different operation to the transaction than if there had been none ; and by taking possession, he assumes his original character of owner. The law allows him to sell, if the insurer does nothing ; and if he surrender the benefit of the sale to the insurer, he has a right to recover for a total loss. He may also buy, if the insurer sell, without waiving his abandonment.

It cannot be that the buying by the original owner shall have the effect to turn a total into a partial loss. This point is most manifest. If *A.* the insurer sells, and *B.* the insured,

(a) 1 *Caines* 297. n. 2 *Caines* 286.

New-Haven,
November,
1814.

King
v.
The
Middletown
Insurance
Company.

who has abandoned, buys the article abandoned, there is no room for fraudulent speculation upon a loss at the expense of the insurer. But if the original owner who has abandoned may sell and buy for himself, it opens a door for fraud. The article will be sold for much less than it is worth; as appears to have been the case in *Ogden* v. *The Fire Insurance Company*. In the first case, where the insurer sells, he is interested to sell for as large a price as he can procure in market. In the other case, where the insured sells, if he is allowed to sell to himself, he is interested to sell at as low a price as possible; and thus it becomes a fraudulent speculation upon the insurer.

The rule that a trustee who sells cannot be the buyer is founded on a principle of sound policy. And in the case in *Johnson*, the Supreme Court of *New-York* recognized this as the ground on which the various decisions in that court went; for in the cases in which the vessel was not thus sold and bought by a trustee, the insured on abandonment was allowed to recover for a total loss. In the case of *Abbott* v. *Broome*,(a) where there was an abandonment for a justifiable cause, the vessel was purchased abroad, not as in the case of *Saidler & Craig* v. *Church* for the benefit of the original owners, but for whom it might concern, and brought to *New-York*, and there sold. This was held to be a total loss.

It is true, in this case, the vessel was not purchased by the original owner. But this cannot make the smallest difference when sold by the insurer, as in the case before the court. If *A.* sells his ship to *B.*, and then *B.* sets it up at auction for sale, it must be the same thing whether *A.* or *C.* purchases her. There is no principle violated. But if *B.* should convey his vessel to *A.* to sell for his benefit, and *A.* should set it up at auction, and employ *C.* to bid it off for him, a sound principle would be violated if such a sale should be sanctioned by law.

Perhaps it will be urged, that this doctrine is at war with that branch of my argument where I contended that an abandonment was irrevocable. I still contend that it is, without consent. In the case in *Johnson*, it was not in the power of the plaintiffs to have retained the vessel so purchased without the consent of the defendants; and if they had insisted upon it, they would have been entitled to all the benefits of the pur-

(a) 1 *Caines* 292.

chase, as the plaintiffs could hold them to pay as for a total loss, if they had surrendered the benefit of the purchase to them. The whole efficacy of the purchase by the plaintiffs for themselves to turn a total into a partial loss depends upon the implied consent of the insurers. The plaintiffs have conducted as willing to surrender their claim for a total loss by selling the vessel, purchasing her, and employing her as if they were owners; for as trustees the sale and purchase must have been for the defendants' benefit. The defendants by making no objection to this proceeding, impliedly agreed that it should be so. When the plaintiffs sold the vessel, they might have sold it to whom they pleased, and allowed to the defendants the purchase money, and have recovered as for a total loss; or the defendants could have insisted that the sale was for their benefit, as the property was theirs, and the plaintiffs their trustees. But they did not; and the plaintiffs having resorted to this method, instead of suing in the first instance for a total loss, to which they were entitled; and instead of surrendering the benefits of the sale to the defendants, claiming them themselves; it surely does not lie in the mouth of the plaintiffs in such case, to say that a loss, which they have treated as partial, shall be turned into a total loss. How entirely different is the case before the court! The insurer, not the agent of the insured as in the case of *Ogden* v. *The Fire Insurance Company*, brings his own property into market; and the plaintiff, who once owned it, purchases it, at a fair sale, in open market. It is utterly impossible to turn such a possession of the vessel thus obtained to the defendants' advantage, unless the law is so that no man can purchase with safety property which he has once owned and transferred.

I am, therefore, of opinion that there ought not to be a new trial.

In this opinion SWIFT, TRUMBULL, EDMOND, BRAINARD and BALDWIN, Js. concurred.

INGERSOLL, J. I am so unfortunate as to differ in opinion from a majority of the court, on the case now brought before us to decide. It seems to me, that a new trial ought to be granted, on the three following grounds.

In the first place, as it strikes me, the entry at the custom-

*New-Haven*, November, 1814.

King v. The Middletown Insurance Company.

New-Haven,
November,
1814.

King
v.
The
Middletown
Insurance
Company.

house in *New-York*, and taking out a part of the cargo, and putting it on board of (what are called) lighters, in order to be transported to *Middletown*, to all intents and purposes, makes *New-York* the port of discharge.

Secondly, if *Middletown*, and not *New-York*, were the port of discharge, still the clearing out and sailing from *St. Ubes* directly to the latter place, would be a deviation from the voyage insured, and of course would discharge the underwriters.

Thirdly, however these propositions may be, yet the insured had no right to abandon and claim as for a total loss, in the case stated by the court in the charge to the jury, as a ground for such abandonment.

Some observations as to the first point. I am aware, that the counsel in favour of the motion for a new trial gave up this point before this Court, though it was urged before the court below. At any rate, if it was not given up, it was not insisted on ; but whether insisted on or not, I think the proposition is a sound one, that the above circumstances made *New-York* the port of discharge. It is an agreed principle, that if any part of the cargo had been actually landed, instead of being put on board of a lighter, it would have put an end to the question as to the port of discharge. *New-York* would, beyond all doubt, have been such port. I hold that it is not a *sine qua non*, that any part of the cargo should be actually landed, in order to make the port, where it is so landed, a port of discharge. The case of landing some part of the cargo is generally put, as being decisive that the voyage is at an end, or at least, that the port where it is so landed is the port of discharge. But the great point in every case must be, whether the vessel has broken bulk ? Whether any part of the cargo has been delivered to the owners or freighters, or whether it has been sold to third persons ? If, for instance, after the entry of vessel and cargo, the cargo, or any part of it, be taken out, sold and put on board of another vessel, and not landed at all, this will make the port of entry a port of discharge. *Marshall*, in his treatise on *Insurance*, vol. 1 p. 257, 8. (*Condy's* edit.) speaking of the risks on goods, when by the terms of the policy, they are insured till they are safely landed, says, " Yet, where a factor, after a ship's arrival at her port of discharge, sells the cargo on board, without unloading, and the buyer of the goods contracts for the freight of them to some other port ;

but before the ship breaks ground, she meets with an accident and is lost : In this case, the insurers are discharged, for the property being changed, and freight contracted for *de novo*, it is the same as if the goods had been landed." For this opinion he cites a book called *General Treatise of Trade*, page 78. True it is, in the case put by *Marshall*, the ship has in fact arrived at her port of discharge, but so far from having landed the goods, she has not even broken bulk ; yet the above circumstances taking place, he says, " it is the same as if the goods had been landed." This proves, that a sale of the cargo in the present case in the port of *New-York*, without ever having landed it, would have been the same as landing it, and would, of course, have made *New-York* the port of discharge.

Still it will be objected, " that there has been in the case under consideration, no sale of any part of the cargo in the port of *New-York*. The whole cargo, both what was taken out, and what remained on board of the ship, belonged to the original owner." Be it so ; but as has been observed, the case I have been considering, proves that it was not absolutely requisite, to land a part of the cargo, in order to make *New-York* the port of discharge.

I am now to show, that such circumstances have taken place in the present case, as in point of law, amount to such landing, and as amounts to making *New-York* the port of discharge. I would ask the question, if the ship had been met at sea by the owner or his agent, and a part of the cargo had been taken out and put on board of another vessel, whether she would not have been discharged of such part ? The answer, as it seems to me, will at once be in the affirmative. The cargo so taken out would not have been under the care and management of the master of the ship ; he would not have been liable for any damage sustained by it, either through neglect or otherwise ; in short, he would have been, as well as his ship, to all intents and purposes, completely discharged from it. If then, there be the same taking out and putting on board of vessels in the port of entry, will not the same consequences follow ? Will not the master be discharged from his duty respecting this part of the cargo, and will not the ship be also discharged from so much of the cargo ? If so, is not the port of entry where such discharge takes place, a port of discharge. The answer must be, yes.

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

At least, so it clearly appears to me. By taking out the cargo at sea as above stated, the ship would have been merely discharged of such cargo, and it would have had no operation on the insurance, inasmuch as by the terms of the policy, the insurance company (the defendants in the present case) were holden till she should arrive at her port of discharge. But when it is so taken out in her port of entry, the very port to which she was destined, she is discharged of it in *a port,* which *ex vi termini* is, and must be, her *port of discharge.*

In the court below, stress was laid on this, that the cargo taken out at *New-York* was barely put on board of lighters, to be carried to *Middletown,* the port of discharge, and therefore *New-York* was not that port. To prove the point, the law respecting losses on board of lighters being the same as if they had been on board of the ship, was brought up. Let us now see how the law stands on this particular point, and how much it will bear on the present question. All the decisions on this point have been in cases of insurance of cargo or goods, till *safely landed* at the port of delivery. Goods have been damaged or lost when on board of the lighter in going from the ship to the shore, and the question has been whether the underwriter should not be holden in all cases, till the goods were actually on shore, or in other words, till actually landed. It was decided in the case of *Sparrow* v. *Caruthers,* reported in 2 *Strange,* page 1236. where the insurance was on goods to *London,* and until they should be *safely landed there,* that the insurer was not liable to a damage sustained by the goods on board of the owner's own lighter. The case was this, " on the arrival of the ship, the owner of the goods sent *his own lighter,* and received them out of the ship; but before they reached the shore, an accident happened, by which they were damaged." Lord Chief Justice *Lee* held, " that the insurer was discharged." He said " it would have been otherwise, if the goods had been sent by the ship's boat, which is considered as part of the ship, and its passage part of the voyage. The jury (of merchants) thought it turned on that distinction, and found a verdict for the defendant accordingly." It is true, this was a *Nisi Prius* decision, but it was made by Lord Chief Justice *Lee,* a very great common lawyer, and by a very respectable jury, peculiarly conversant with the law of insurance. I know not, that this decision has ever been contradicted,

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

though I am sensible, the propriety of it has been (and as I think injudiciously) questioned by some judges, in more modern times. It had indeed been previously determined by the same judge, in the case of *Tierney* against *Etherington* cited in 1 *Burrow* 348., " that if it were the usage of the trade, that all goods in that particular trade should be landed by the owners of such goods in their own lighters, the risk would continue in those lighters." This, as I apprehend, would depend on the usage, and on the knowledge of the same, on the part of the insurer. It is now, however, well established, that if goods are damaged on board of a public lighter, the loss will fall on the insurer. In the case of *Rucker* v. *London Assurance Company,* tried before Mr. Justice *Buller* at *Nisi Prius, June* 8th, 1784, as appears by *Marshall on Insurance,* pages 253, 4. (*Condy's* edit.) the judge thus addresses the jury : " The decision of this cause depends on the usage ; but the fact of usage being once established, the question whether the underwriter is liable or not, is matter of law. But it belongs to the jury to say, whether that which has been done here, be or be not within the usual course of trade. The distinction is between public lighters and those which are the property of the merchant, and work only for him. Public lighters have a stamp of authority. They are entered at *Waterman's Hall.* The case of *Sparrow* v. *Caruthers* does not affect this case. If a merchant will not send public lighters, it shall be a delivery to him, when the goods are put on board his own lighters. But lightermen, appointed by the waterman's company, are *public officers,* and have a public credit." But though it has been determined, that the insurer is liable for damage done the goods on board of a public lighter, yet it is expressly laid down by Mr. Justice *Heath,* as appears by *Marshall,* page 255. (*Condy's* edit.) speaking of the case then under consideration,(*a*) that the master and the owners of the ship were discharged when the goods were put into the lighter ; but the freight and insurance are not commensurate ; the latter is far more extensive than the former. It will be noticed, that the case abovementioned was not a case of insurance on a ship till her *arrival at her port of discharge ;* but on goods *until they are safely landed.*

(*a*) *Hurry & al.* v. *Royal Exchange Assurance Company,* 2 *Bos. & Pull.* 430. S. C. at *Nisi Prius,* 3 *Esp. Rep.* 289.

King
*v.*
The
Middletown
Insurance
Company.

These decisions respecting losses sustained on board of lighters do not, however, directly apply to the present case. These cases were not exactly like this case. If an insurance had been on the cargo, and a loss had happened to that part of it taken out and shipped to *Middletown,* on a question whether in such case the insurer would be liable, these cases would more directly apply. But even if this were the question, what a mighty difference there is between those lighters spoken of in the cases above referred to, and these vessels called lighters, in the case under consideration? The former were water craft made use of to land the cargo at the several places within the port of *London,* where it was most convenient for the owners to have it landed; and made use of either because the ship was too deeply laden to go to the several landing places, or because it would be very inconvenient for her so to do after the entry. The latter were vessels on board of which the cargo was put, to be transported from *New-York,* one port of entry, the distance of more than one hundred miles, to *Middletown,* another port of entry. In no sense, as I think, can these vessels (called lighters) be considered as public lighters, or as any such kind of lighters, as have obtained that name, to land cargoes from ships in the port of *London,* or any other port in *Great-Britain.* If so, the voyage was at an end so far as respected the part of the cargo taken out of the ship. That part of the cargo was delivered from the ship in the port of *New-York.*

If the point be not perfectly clear, that *New-York* was in fact the port of delivery or discharge, I will put a case which perhaps may throw light on the subject. Suppose a ship is insured from one of the *West-India* islands to her port of discharge in the *United States,* and being cleared out for *New-Haven,* she arrives there, and after having entered her cargo, the whole is taken out and put on board of packets, and sent to *New-York,* without ever having been landed; will not *New-Haven* be her port of delivery? There can be no question about it. *New-Haven* must be considered as her port of delivery. Is there any difference between the case put, and the case under consideration? I think not. In both cases, I take it, there must be a clearing out of the cargo re-shipped. But in the cases decided in *Great-Britain,* the landing is all in the port of entry. There is no new voyage, no new clearing out. But let it be remembered, that accord-

ing to the above cited opinion of Mr. Justice *Heath*, as respects the master's being discharged of the cargo, it makes no difference, whether or not an insurer on goods would be liable for a damage sustained on board of a lighter. In every case, according to his opinion, when bulk is broken, and the goods or cargo are put into a lighter, from that moment the master is discharged from any care or oversight of them ; and of course, the ship must be discharged of them also. I have now done with this point.

Secondly, I am now to show, that if *Middletown*, and not *New-York*, was in fact the port of discharge, yet the clearing out and sailing from *St. Ubes* directly to the latter place, was a deviation from the voyage insured, and of course discharged the underwriters.

It is a fixed principle of the law of insurance, that a ship insured from one port to another particularly designated, must go the direct, usual course from the former to the latter. It then follows, if in the present case, the insurance had been from the ship's last port in *Europe* to *Middletown her port of discharge*, her going to *New-York* but from necessity would have been a deviation, and the insurance company would have been discharged from the loss that happened.

As to the principle of law thus laid down, and as to its application to the supposed case of insurance, as above stated, there has been no controversy in the argument of this case. Taking this principle of law to be a correct one, it appears to me to be a proposition nearly self-evident, if the particular port of discharge be not named in the policy, but the insurance be to her port of discharge generally, in the *United States*, wherever *that* shall be, that this port must be selected in time so as to enable the ship to sail in the usual course from her last port to it. If the insurance be from one port to another, the voyage, it is agreed, must be direct, in the usual track ; if it be to any port within a certain district, I say, the voyage must be equally direct. The only difference in the two cases is, that in the latter, the insured may, after the insurance has been effected, designate the port of destination, but when it is once designated, and the voyage is entered upon, it must be direct, in the usual track, to such port.

But a decision of the Supreme Court in *Massachusetts* is cited, as being contrary to this doctrine. This decision, if

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

it be in point, certainly carries great weight with it. But though made by the ablest judges, if it be opposed to the general principles of insurance law, and moreover, if it be a solitary decision, I should not implicitly give credence to it as an authority, about which there could be neither disputation nor doubt. I know not any decision in *Great-Britain* directly on the particular point now under discussion ; nor indeed do I know any in this country on it, unless the one above alluded to be so.

But let us see what this case in the Supreme Court of *Massachusetts* was ; and whether, in all points, it will compare with the case under consideration. It is reported in the eighth volume of *Massachusetts* Reports, from page 527 to 531, inclusive. The report states the case to be " an insurance on property on board of the schooner *Cremer*, at and from *Boston* to her port of discharge in *Europe;* including blockaded ports, and until there safely landed, and in quiet possession of the consignee thirty days. It was also contained in the policy, that it was understood that all risks of every name and nature (bad debts and illicit trade excepted) were included in the policy ; that the vessel, though cleared for *Tonningen*, was intended for some port in *Holland*, or wherever else the master should deem proper, *in case he could not get into Holland;* that by illicit trade in the policy was understood an infraction of the municipal laws ; but the assured was to take the risk of *French* and *Dutch* decrees against *American* commerce ; at a premium of 25 per cent, to return 10 per cent, if from any cause the vessel should not discharge in *Holland*, or any blockaded port, and there should be no loss on the policy. The case goes on to state, that the schooner with her said cargo sailed from *Boston*, on the 28th of *March* 1810, and proceeded on her said voyage ; and having escaped the *British* blockade of *Holland*, went so far up the *Maese* that she might have gone to *Rotterdam*, to which she was then proceeding, secure from capture by any *British* cruiser, or any blockading force. But the master being there informed by his owner's correspondent in *Rotterdam*, that if he entered that port with his vessel, he would not be permitted to enter or land his cargo there, or in any port in *Holland;* and that his vessel and cargo would be seized and confiscated, if they were discovered by the *French* guards, or custom-house officers ; and there being imminent danger

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

thereof, he immediately proceeded with said schooner and cargo for *Gottenburgh*, to ascertain whether his cargo could be sold there to advantage, and if not, to what market in the north of *Europe* it would be best to carry it. He arrived at *Gottenburgh* on the 13th of *June*, and remained there until the 21st of the same month ; when he left *Gottenburgh*, with the schooner and cargo, to proceed for a market in the *Baltic.* On the day following, he was captured by a *Danish* privateer, and carried into *Copenhagen*, where he arrived on the 26th, and where the vessel and cargo were libelled as prize, and after an acquittal at the lower court, were condemned on an appeal." The arguments of counsel I shall omit, and proceed to state the opinion of the court, which is as follows : " Two objections are made on behalf of the defendants to the right of the plaintiff to recover in this action. First, it is said that after the vessel had eluded the blockade, and had gotten safely into *Holland*, she had no right to leave *Holland* and go elsewhere at the risk of the underwriter. But our opinion is, that by getting into *Holland*, as it is used in this policy, must be understood getting in for some beneficial purpose, as the sale and delivery of the cargo, which was known to be the sole object of the voyage. The master had a right, and it was his duty, after receiving the information which he had from the correspondent of the plaintiff at *Rotterdam*, to depart from the *Maese*, and seek some other port to discharge his cargo, as it would have been his duty to do, in case he had been boarded and warned to depart by a blockading squadron or ship, on his approaching the river. It would have been as wicked as imprudent for him, under the circumstances, to have pursued his route to *Rotterdam*. This objection, therefore, cannot prevail. The second objection is, that even if the master had a right to leave *Holland* under the existing circumstances, yet that the policy having limited the voyage to one port only, the vessel must have discharged at *Gottenburgh*, and that the voyage contemplated by the policy must cease there. The determination of this objection depends on the construction to be given to the words *port of discharge.* As it appears that the policy was made some time after the vessel had sailed, it is presumable that no particular port of destination had been fixed upon previously to her sailing, and that it was left to the discretion of the master or supercargo to what port he should go.

King
*v.*
The
Middletown
Insurance
Company.

If he had broken bulk, or begun to unlade, at *Gottenburgh,* that must have been considered the port of discharge, and the voyage would have ended there within the policy. But we think, and in this opinion we are confirmed by that of several eminent underwriters of whom we have enquired, that when property is insured to a port of discharge, the *assured has a right to obtain advice at his port of arrival,* respecting the markets, and having informed himself, has a right to proceed to such port as promises the best sales, and still is protected by the policy; not being obliged to discharge his cargo at the first port he makes."

We have now before us this case determined in the Supreme Court in *Massachusetts,* and the opinion of the court on the same; and it will be seen, that it differs in some points from the case under consideration, and as I think, in some material points. It will be noticed, that it was expressly stipulated in the policy, that though the schooner was cleared for *Tonningen,* yet that the voyage was intended to some port in *Holland,* " or wherever else the master should deem proper, in case he could not get into Holland." The whole coast of *Holland* being blockaded at the time, the master must get into such port as was, under all circumstances, most convenient for him. If possible, he must avoid the blockading ships. To do this, no plan could have been devised previously to his sailing, even if the insurance had been effected before the schooner left *Boston.* From the nature of the voyage, therefore, and from the situation of the ports in *Holland,* as respected the blockade, it was impracticable to go in a direct usual course from the port of *Boston* to the port of discharge. It was impossible to foresee, in which, or whether in any, of the ports in *Holland,* the cargo could be discharged. It must have depended on the discretion of the master, to steer one course or another, in order to avoid the blockade, and to get into port. But if he should not be able to get into any port in *Holland,* he might steer for any other port in *Europe.* In this situation, it must be a matter of judgment with him, to what place to direct his course. He could not, if turned off from the coast of *Holland,* have any means in his power to determine where he could find the best market for his cargo. To ascertain this, it would seem not only expedient but necessary, to steer for some port, to make enquiry as to the state of the markets. This would

be prudent and proper, and would be the usual course of acting and proceeding, when under such circumstances. If an insurance then be made on the vessel, or the cargo on board of the vessel, bound on a voyage of this description, all these things above related will be taken into consideration, and the underwriter insures against a loss happening in the voyage conducted in a prudent manner, and as such voyages are usually conducted. If after having been turned off by a blockading squadron, it would be the usual course, to go to a port, to enquire into the state of the markets, the underwriter would be holden for a loss happening after leaving such port of enquiry.

These principles governed the court in *Massachusetts.* They went upon the ground, that the insurance was made some time after the vessel had sailed, and that it was left to the discretion of the master at what port he should discharge his cargo : That it being impossible to sell the cargo in *Holland,* made it necessary to leave that country, and to go for a market somewhere else : That it was competent for the master to go to *Gottenburgh* merely to enquire with respect to the state of the markets : And that " when property is insured to a port of discharge, the assured has a right to *obtain advice at his port of arrival* respecting the markets, and having informed himself, has a right to proceed to such port as promises the best sales, and still is protected by the policy ; not being obliged to discharge his cargo at the first port he makes."

I think this decision may well stand, and yet the defendants in the present case be liable to no damages for the loss, that has happened. Let the decision in *Massachusetts* be a precedent for all cases circumstanced as that was. It certainly can be for none other.

That insurance was an insurance on a foreign voyage, until the vessel arrived in a foreign country, at her port of discharge, and thirty days after. It was an insurance in which much discretion was left with the master, as to what course to steer, as well as at what port to discharge. It was a voyage in which it was necessary that sales should be immediately made, and also should be made to the best advantage. It was a voyage in which it was impossible to know where the best market was, except at some port of arrival ; and of course, the port of discharge must be sought for

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

after the arrival on the *European* coast. In a voyage of this kind, perhaps the principle as laid down by the court, was correct, that " where property is insured to a port of discharge, *the assured has a right to obtain advice at the port of arrival* respecting the markets, and having informed himself has a right to proceed to such port, as promises the best sales, and still is protected by the policy ; not being obliged to discharge his cargo at the first port he makes." This opinion, I say, may be correct, especially if fortified by that of eminent underwriters. But be it remembered, that the opinion of underwriters, as to the general principles of insurance law, can be of little avail ; but has weight only, as to the usage of trade : that is to say, as applicable to the case before the Supreme Court, such opinion of underwriters may and ought to have weight, stating what had been the practice in looking out for a foreign market in voyages of this kind, and what in such cases had been the construction of policies, where an insurance had been made to a *port of discharge* generally.

Taking this decision as a precedent, yet as has been observed, it can be only so, in a case circumstanced as *that* was, which was there decided. The case before us, as it strikes me, is a different one from the case in *Massachusetts.* It is an insurance on a voyage from the *United States* to certain ports in *Europe,* and from thence to *the port of discharge* in *America.* There was nothing to interrupt the pursuance of a direct course from *St. Ubes,* the last port of clearance in *Europe,* to *New-York* the port of destination. There was no blockading force to turn the ship off from *New-York,* and to oblige the master of the ship (the owner's agent) to cast about him, and deliberate, at what port he could best sell his cargo. It was not competent for him to go into any port and enquire into the state of the markets, and to act accordingly. He had nothing to do with selling the cargo. The voyage from *St. Ubes* to *America,* was a voyage *home,* to the place and country where the owner resided. A correspondence between the owner and master could be constantly kept up, while the latter was in *Europe,* in which he might be informed what was the state of the markets here, and be directed whether to clear out for and come to *Middletown,* or some other port. And that instructions were in fact given him, to make *New-York* his port of arrival on the voyage

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

home, there can be very little doubt. In truth, if he had not been otherwise directed, he must and ought to have shaped his course, so as to have made *Middletown* his port of arrival.

Such then being the case, can it be said, that the owner being at home, may direct the master to bring his ship to the port of *New-York* as a port of enquiry, and after her arrival, to order her to *Middletown*, and the underwriters be holden for this loss? In the case decided in *Massachusetts*, inasmuch as no sales could be made in *Holland*, the place of destination, it seemed to be a matter of necessity, for the master to carry his vessel to some port merely to enquire with respect to the markets. The policy expressly authorizes his leaving his place of destination, and seeking a market in some other place or country, in the happening of certain events. The present policy gives no latitude to range from one port to another. In the present case, there was no absolute necessity of selling the cargo immediately, and for that purpose, immediately to look out for a market. There can, therefore, be no usage as to going to a port to look for a market, as in a foreign voyage, and particularly, as in such a one as was under the consideration of the court in *Massachusetts*. Indeed, it was asserted in that case by the counsel for the insurer, and not contradicted either by the opposite counsel, or by the court, that in an insurance to the port of discharge in the *United States*, "it never had been understood that the vessel had a right to range from port to port to find a convenient market for her cargo." I say, this position was not contradicted by the court, unless the decision in that case contradicted it, which, I think, it did not.

If after the arrival of the ship at *New-York*, the owner (the plaintiff in the present case) had a right to order her from thence to *Middletown*, he had the same right to order her from *New-York* to *New-Orleans*, a voyage, I presume, of more hazard than from *St. Ubes* to *New-York*. If this be law, the premium is not at all proportioned to the risk. Indeed, going on this ground, there is no knowing what premium to take. I am, therefore, clearly of opinion, that on this point the case is with the defendants.

But thirdly, whether the case be with the defendants or not, on the two grounds I have been considering, yet as it appears to me, the right of abandoning and of claiming as for a total

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

loss, would not accrue on the happening of any of the events stated in the charge as such ground : Or, to be more explicit, that it was incorrect for the court to charge the jury, that if they should find the vessel to have been in a situation extremely hazardous, when on the rocks, and farther, if they should find, that the insurers refused to bear the expense of attempting to get her off, these circumstances would justify an abandonment and claim as for a total loss.

In the first place, I will attempt to show, that the ship being on the rocks, and in a situation extremely hazardous, apart from the circumstance of the insurers refusing to bear the expense of attempting to get her off, will form no ground for an abandonment. Secondly, I will then endeavour to show, that the refusal to bear the aforesaid expense, will be no additional ground for an abandonment.

A few observations as to the first proposition. It is a clear principle of law, that a contract of insurance is a contract for an indemnity merely : It is a contract for a satisfaction to the insured for damage which may be sustained, on the happening of an event or events, which satisfaction is to be proportionate to the damage sustained. As to damages to be recovered, it stands on the same ground with every other contract, to wit, that so much shall be recovered, and so much only, as will repair the injury sustained. If the property insured be totally lost, the whole sum put at hazard for the safety of that property, shall be paid by the insurer. If however, it be but partially damaged, such sum shall be paid, as bears the same proportion to the whole money put at hazard, as the property in a damaged state does to its value in a sound state. Where the property is totally lost, beyond all recovery ; as for instance, if it be destroyed by fire, sunk in the middle of the ocean, or captured by an enemy at open war, and duly condemned ; in all these cases, there is no need of an abandonment, in order to recover as for a total loss. But where a loss is total for a time, and by the happening of after events, becomes partial ; as by the capture and recapture of a ship, it is absolutely necessary to abandon to the underwriter while the loss *is total,* in order to recover more than for an average loss.

There may be also what may be called a *technical total loss,* and in such case, if a recovery is to be had as for a total loss, an abandonment *must* take place. A technical total loss is

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

where the property insured is in existence, but in such a damaged state, as to be of little or no value to the owner : as if a ship and cargo be so damaged, as that the voyage be totally lost, or not worth pursuing ; if salvage be high ; if in case of insurance on a ship, she is so much damaged as to be not worth repairing ; if in case of goods, salvage perhaps be not worth the freights ; in all these cases, the insured may abandon the property the subject of insurance to the insurer, for him to make what he can of it, and recover as for a total loss.

But this I take to be a fixed principle, that the insured cannot by abandonment turn what is in its very nature but a partial loss into a total one. When I say partial loss, I do not mean any of the above cases, where in fact the loss is but partial, but the property saved is hardly worth having. Every abandonment is made on the ground, that the property is either totally, (as in the case of a capture,) or technically, lost.

Now comes the question whether a ship's being on the rocks, and in an extremely hazardous situation, will justify the owner and insured, to abandon her to the insurer : In other words, whether her being in that situation, is a technical total loss of her.

I am of opinion, that it is never a ground for abandoning a ship to the insurers, that she is in a hazardous, nay very hazardous situation, and in great danger of being lost. Though in such a situation for a time, yet if she gets out of it, but by sustaining a partial loss, notwithstanding the abandonment, damages can be recovered but for the actual injury or loss sustained, which, in fact and in truth, is partial only. No speculation can be made by the insured from the happening of this event to make money out of the insurer. If extreme danger of being lost be a ground of abandonment, there is no knowing where to stop. A ship though not aground, nor on the rocks, may be in extreme danger of going ashore in a gale of wind ; she may be at sea, and in a tremendous gale be in extreme danger of foundering ; and if being in a situation extremely hazardous be the criterion to determine whether an abandonment may be made, in each of these instances the insured may abandon, and though little or no damage be sustained in the gale, he may turn what really was little or no loss, into a total one ; and if the property be insured well up, may make a handsome speculation

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

for himself. No; this is not the principle. No extreme hazard will justify an abandonment, provided that, in the event, though the danger was great, yet the damage was but partial. Though the vessel was in the utmost hazard, yet she escaped every danger, and is safe.

*Marshall* says, " Shipwreck is generally a total loss. What may be saved of the ship or goods is so uncertain, and depends so much on accident, that the law cannot distinguish this from the absolute destruction of the whole. The wreck of the ship may remain and may be saved, but the ship is lost. A thing is said to be destroyed when it is so broken, disjointed, or otherwise injured, that it no longer exists in its original nature and essence."(a) And again, " But the mere stranding of the ship is not of itself deemed a total loss, so as to entitle the insured *immediately* to abandon. If by some fortunate accident, by the exertions of the crew, or by any borrowed assistance, the ship be got off and rendered capable of continuing her voyage, it is not a total loss, and the insurers are only liable for the expenses occasioned by the stranding. It is only where the stranding is followed by shipwreck, or in any other way renders the ship incapable of prosecuting her voyage, that the insured is entitled to abandon." " It is a rule that, to entitle the insured to abandon, there must have been, at some period of the voyage insured, or during the continuance of the risk, a total loss."(b)

To prove the above propositions, he cites a number of cases determined in *Westminster Hall,* and among them, the case of *Cazalet* v. *St. Barbe,* reported in 1 *Term Reports,* page 187. It was an insurance on the ship *Friendship* from *Wyburgh* to *Lynn.* In an action on the policy, the defendants pleaded a tender of forty eight pounds. The plaintiff claimed as for a total loss, and upon the trial of the cause, it appeared that the ship had suffered so much in her voyage, that when she arrived at *Lynn,* she was not worth repairing. The damage, however, sustained by the ship did not exceed 48 *per cent,* the sum which the defendant had paid into court upon his plea of tender. Upon this case the defendant insisted that this was a *partial* and not a total loss, and that therefore the plaintiff had no right to abandon. The court were clearly of opinion, that the owner cannot abandon but in the case of a total loss, and that they could not determine,

(a) 2 *Marsh. Insur.* 582. c. (*Condy's* edit.)      (b) *Ibid.* and p. 583.

that there had been a total loss, when the jury found, that there was only a loss of 48 *per cent.* Mr. Justice *Buller* in giving his opinion in this case says, "Nothing can be better established than that the owner of a ship can only abandon in the case of a total loss happening, *at some period or other of the voyage;* which cannot have happened in this case, as the jury have expressly found, that the loss amounted to 48 *per cent.*" He says further, "The true way of considering the case is, that it was an insurance *on the ship for the voyage;* and if either the ship or voyage be lost, it will be a total loss; but here neither was lost. The case of *Hamilton* v. *Mendes* is decisive."

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

This case of *Hamilton* v. *Mendes* is reported in 2 *Burr.* 1198. and 1 *Black.* 276. A statement of the case and the opinion of the court appears in *Marshall on Insurance* from page 572 to page 578, inclusive. In page 574, he quotes the opinion of Lord *Mansfield* in the following words: "The plaintiff's demand is for an indemnity. His action then, must be founded on the nature of his damnification, *as it really was,* at the time of the action brought. It is repugnant, upon a contract of indemnity, to recover as for a total loss, when the final event has determined that the damnification is, in truth, an average loss. Whatever undoes the damnification, in whole or in part, must operate upon the indemnity in the same degree. It is a contradiction in terms to say, that an action will lie for an indemnity, when upon the whole event, no damage has been sustained."

It seems to me, that it is now proved from the reason of the thing, as well as from authorities, that the charge as above stated was incorrect, inasmuch as a situation *of extreme hazard* is a very different thing from a total loss of the ship.

Secondly, I will now attempt to show, that if to the circumstance of an extremely hazardous situation be added a request to and refusal by the defendants to bear the expense of attempting to get the ship off the rocks, all these things will not make them liable for a total loss. I am well aware that Chief Justice *Parsons,* in giving the opinion of the Supreme Court in *Massachusetts* in *Wood* v. *The Lincoln and Kennebeck Insurance Company,* 6 *Mass. Rep.* 483. says, "If the ship be stranded in a place where assistance, materials and workmen may be easily procured, but it may be doubtful whether the attempt to get her off will succeed, while the

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

expense is certain, if the insurer on having notice, will not engage to pay the expenses of the attempt, and also to *repair the vessel, if the attempt should succeed,* the assured may abandon. For in this case, as he cannot recover more than a total loss, he shall not be holden to labour for the recovery of the ship, which he must do at his own expense, if he should be unsuccessful." It seems to me, it was not necessary in deciding the case then under consideration, to have recourse to the above principles thus laid down by the Chief Justice. It was a case, in his opinion, of a mere stranding, not of a shipwreck. In discussing it, he fully agrees with what I have quoted from *Marshall,* "that if the ship be stranded only, it is no ground for an abandonment, and claim as for a total loss." He says in so many words, in that same page 483. "When a ship is stranded, the assured cannot for that cause merely, immmediately abandon." The plaintiff (the insured) abandoned immediately after she had got upon some rocks, and was stranded, but did not request the defendants to be at any expense in getting her off. These being the facts, the Chief Justice upon his own principles must have decided against the claim of the plaintiff, as for a total loss, inasmuch as when the abandonment was made, there *was* no total loss, either real or constructive. True it is, a few days after the vessel got upon the rocks, she overset and sunk, and the defendants, unrequested, weighed her up, and restored her to the plaintiff's wharf fully repaired. The court determined the loss not to be total.

The above stated opinion of the Chief Justice, however, has great weight, even if it be an *obiter* opinion, as he certainly was one of the most able judges that ever sat on the bench, in this or any other country. Yet it cannot be considered as an authority, unless it was necessary to give it, in deciding that case.

I have seen no case, that has been decided on the ground taken by him. There was an opinion expressed by Lord *Mansfield,* in the case of *Hamilton* v. *Mendes,* 2 *Burr.* 1198. which at first view appears to be somewhat similar to this opinion of Chief Justice *Parsons,* but by comparing the two opinions with each other, the similarity is not very striking. This opinion was also, as I think, given unnecessarily, because the case he was considering did not require it. It was a case of insurance on a ship and goods from *Virginia* to *Lon-*

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

*don.* In the course of the voyage, the ship was captured, re-captured and carried into *Plymouth.* While there, the insured abandoned to the insurer. The latter refused to take the ship, but was ready to pay the salvage, and all other losses and charges sustained by the capture. The court determined, that though the loss was total, while the ship remained in the hands of the enemy, yet it was not so, after the re-capture and her arrival at *Plymouth.* That the abandonment having been made while the loss was but partial, from this very circumstance, it was improperly made, and was inoperative. The plaintiff claimed as for a total loss, and failed. It ought to have been further stated, that the ship was brought from *Plymouth* to the port of *London,* by the order of the owners of the cargo, and the re-captors, and that the ship sustained no damage from the capture. In delivering the resolution of the court, Lord *Mansfield* said, " It does not necessarily follow, that because there is a re-capture, therefore the loss ceases to be total. *If* the voyage be absolutely lost, or not worth pursuing ; *if* the salvage be very high ; *if* further expense be necessary ; *if* the insurer will not engage, at all events, to bear that expense, *though it should exceed the value, or fail of success ;* under these and many other like circumstances, the insured may abandon, notwithstanding there was a re-capture." That is to say, as I understand it ; if by means of a capture and re-capture, such be the state of things, that the voyage is so far broken up, as not to be worth pursuing, and even if pursued, expense will be necessary for repairs and for refitting, the insured may, under those circumstances, abandon to the insurer, and claim as for a total loss, unless the latter will come forward and engage to pay this expense, be the amount ever so great. He meant to be understood to say, that an abandonment might take place in the extreme cases put by him, even though the property insured was not absolutely all lost and destroyed, unless the insured would engage to bear the expense above stated. That he meant to say no more than what I have just stated, I think, is clear, not only from the manner of expression in giving the opinion, but also from his citing the case of *Goss* v. *Withers,* previously determined by the court of King's Bench, as a case in which it was decided that an abandonment might be made, inasmuch as the voyage was completely broken up, and " the insurer

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

did not engage to be at any expense." This reference to the case of *Goss* v. *Withers* is in page 1212 of the same volume of *Burrow*, and is a part of the report of the case of *Hamilton* v. *Mendes.*

This opinion of Lord *Mansfield,* I agree, is founded in good sense, though it should be considered as an *obiter* opinion, as respected the case he was then deciding. Whenever a constructive total loss has taken place, by a voyage being ruined in the manner above stated, it would be very unreasonable to oblige the insured to pursue it at his own expense, inasmuch as the losses, repairs and expenses on the winding up of the business very probably might not only exceed the sum subscribed by the insurer, but also, might eat up (if I may use the expression) vessel and cargo. Unless therefore, the insurer will engage to pay all the expense, though it may exceed the sum he agreed to hazard, the insured may abandon to the insurer, and let him make the best of the business.

The opinion of Chief Justice *Parsons* in the case before him was, that if a vessel be merely stranded, for which alone, *he* agreed, an abandonment could not be made, yet even in this case, if the insurer " will not, on notice, engage to pay the expense of getting her off, and also, *to repair the vessel if the attempt to get her off should succeed,* he (the insured) may abandon." Though I can subscribe very fully to the above mentioned opinion of Lord *Mansfield,* yet I cannot so fully to that of Chief Justice *Parsons.* There are strong reasons, why to prevent an abandonment, the insurer should explicitly engage to pay all the expense, in the case put by Lord *Mansfield,* because without such engagement, as events might be, he would not be liable to pay it at all, or at least, but a part of it. In the case put by Chief Justice *Parsons,* the abandonment may be made, while the loss is partial only, unless the insurer will engage to pay all the expense of getting off and repairing, let the loss be total or partial; for there is no exception made of a partial loss. Indeed, the probability is, if the vessel be got off and repaired, that it will eventually be but a partial loss. If so, that is, if it turn out to be a partial loss, the insurer, of course, without any engagement on his part, will be holden to pay his part of it. His putting his name to the policy secures this payment. If the ship be insured to the full value, he must pay the loss, whatever it is, not surmounting the value; or, at any rate, not coming up

*New-Haven*,
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

to the value.   If she be insured to a sum short of the value, say for instance, to one half the value, he must pay one half of the loss, and the owner or insured, must pay the other half; or rather, (which amounts to a payment,) must sustain the loss of the other half, without any indemnification. Hence may be seen the impropriety of calling on the insurer to bear the expense accruing from the damage sustained, as long as this damage is merely partial.   As the case may be, the insured himself, for the reasons just given, must be at a part of such expense.

Further, to call on the insurer to engage to pay for the *repairs* of the ship after she shall have been extricated from her difficulty, seems to go on the ground that the loss *will be* partial, but that notwithstanding this, the insurer must engage to pay for these repairs, or the ship will be turned on his hands.   This appears to me to be unreasonable, and not to be warranted by any authority, that I have seen.

The true reason of calling on the insurer to make any engagement about expenses is, that inasmuch as by the policy he will not be obliged to pay such expenses, he therefore must either engage to pay the expenses, or take the ship. Such a state of things can only be, when in point of law, a total loss has happened.

If then it cannot be considered as settled law, in consequence of decisions on the very point, that the charge to the jury in the present case was correct, I think, on fair, legal principles, it was incorrect.   It being a principle of law, that there can be no abandonment of the ship to the insurer, unless in point of law a total loss has intervened; and it being also a principle of law, that such loss has not intervened, by a ship's being in a situation extremely hazardous; it is difficult for me to conceive, how a refusal of the insurer to be at the expense of getting her out of danger, can alter the state of things, in other words, can turn a partial loss into a total one.

But it is said, to be very possible, that by the utmost exertions, the ship or the property insured, be it what it may, never can be extricated from this hazardous situation, but must eventually be lost.   In such case, that is, if there be a total loss, the insured can recover no more than the sum put down in the policy, as being hazarded, whether the same be a complete indemnification or not.   Be it so, that he can re-

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

cover nothing but the sum insured, (as I believe he cannot) when he goes for a total loss on the policy. In case of a stranding, however, it is hardly presumable, that the whole loss, including all expenses of every kind, will overgo the sum named in the policy, if the insurance be to the full value.

But further, is it not the duty of the insured as well as that of his agents, the master and mariners, to do all they can to save the property insured, whenever it is in jeopardy? Can he or they be by, and say " we know not, whether we shall get payment, and therefore we will do nothing to secure the property insured?" Certainly not.

But again, must not the insured wait until the saving of the ship (if the insurance be on a ship) is hopeless, entirely so, before he can abandon? If the situation be extremely hazardous, but not hopeless, the insured cannot divest himself of the ship, or the property insured. In such a case, there is no total loss, in any sense of the words ; and the insurer, when called upon to bear the expense, may say to the insured, " the property is yours, not mine, and you must take care of it."

As has been observed, there must have been in the course of the voyage a total loss, either absolute, or in point of law so, in order to justify an abandonment. But in the case under consideration, how can it be said, there has been a total loss, when soon after the abandonment, the ship was got off the rocks, by some person or other (no matter by whom) with sustaining a trifling damage? Suppose she had floated off without the exertions of any one, at the time she was made to float by the exertion of individuals, and with receiving no more damage, than she actually *did* receive ; would the loss *then* have been total? It seems to me, it cannot be so said. I beg to know, where is the difference between the two cases? If the refusal to bear the expenses be the criterion to determine, whether the loss be total or partial, her floating off of her own accord (if I may use the expression) would have made no difference in the case.

But the fact is, there has been no total loss, either *actual* or *constructive*. The event has proved, that no abandonment could have taken place.

If after the abandonment, the ship had gone to pieces on the rocks, and had become a perfect wreck, a different case from the one we have been considering, would have been

presented to the court. In such a case it might have been strongly argued, that the event had proved the abandonment to have been properly made. The *fact* of a total loss would have actually existed, and that the ship was in a desperate and hopeless situation, when she had been abandoned, might have been very naturally inferred. Let me repeat it, the true ground of abandoning, as I apprehend it, is, that there must be a constructive total loss, at the time when it is made ; and nothing will prevent its going into effect, but an engagement on the part of the insurer to pay all expenses of refitting, repairing, or of whatever nature they may be, or to whatever amount they may be. He can then make his calculations, whether it will be best for him to take the ship, and pay the sum subscribed by him, or to let her remain with the insured, and pay the above expenses. But that he should be obliged to engage to pay expenses, at a time when in fact there is not, and when it is a matter of total uncertainty whether there ever will be, a total loss at all, appears to me to be an unsound position, one that will work great injustice. If for want of this engagement, an abandonment may be made, the insured may make money by the loss. Because clear it is, if it does not turn out to be a total loss, the insurer never will insist on the abandonment, unless he has overvalued, or unless he can, in some way or other, make a good speculation, by the events that have happened. But as has been observed, the object of an insurance is an indemnity merely, not for the insured to make a good speculation out of the insurer.

I am, therefore, of opinion, that on the three beforementioned grounds, there ought to be a new trial. I fear I have been tedious ; but I have great names opposed to my opinion ; and from this circumstance, it seemed necessary to examine more minutely all the points, that I thought would bear on the question, than, under other circumstances, might have been thought necessary.

SMITH, J. I agree fully in the opinion expressed by the Chief Justice so far as it respects taking out a part of the salt and putting it into lighters for the purposes mentioned in the motion.

But on other points in this case I have formed a different opinion from the one given by him. It appears to me, that the voyage terminated at *New-York*, and that the policy was

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

King
*v.*
The
Middletown
Insurance
Company.

at an end before the accident happened. In this policy, the ship was insured from *St. Ubes* to her port of discharge in the *United States.* The port of discharge not being named in the policy, gave a right to the insured of electing one ; and this is the whole extent of his privilege. It gave him no right to elect two ; but when he had once exercised the power given him, he must be bound by it. This election was actually made by clearing out for *New-York,* and further evinced by actually arriving in port. But if there was still any doubt on this subject, the fact of entering the vessel and cargo at the custom-house, and paying the duties, ought to be conclusive ; but if a doubt still existed, it would render the *intent* with which all this was done material. And the intent should have been left to the jury.

I admit, that no port is literally a port of discharge without unlading the vessel in it, or beginning to unlade by breaking bulk ; but I proceed upon the ground that the insured, having proceeded thus far, is bound to make *New-York* the port of discharge ; and whether he does or not, that the policy is at an end, the same as it would have been if *New-York* had been named in the policy as the port of discharge. If however we admit, that the insured might elect another port of discharge ; and as the ship was on her passage to *Middletown* with a view to discharge her cargo when the accident happened, that this is to be considered the port of discharge, still we meet with insuperable difficulties in our way ; for in this view, there has been such a deviation in going into *New-York* as to discharge the insurers. The port of discharge under this policy is the port of destination, to which the insured was bound to proceed by the shortest and safest course ; and it is admitted in this case, that the ship had entirely changed its course before the accident happened. Had *Middletown* been named in this policy, it would be admitted, that the deviation in going into *New-York* would discharge the underwriters ; and why not the same when that omission is supplied by the insured ? But it has been said, that the captain might go into *New-York,* and wait for orders from the owners, who might then direct at what port he should discharge the cargo ; and this is the ground assumed by the court below in charging the jury. But for this position there is no foundation in point of fact. The defendant expressly denied this, and claimed that the

captain went there, not *to wait for orders,* but with *intent to discharge the cargo.* And the court, after deciding this fact to be immaterial, could not assume it as true, or otherwise.

But if the fact had been admitted, or it had been found by the jury, that the captain went into *New-York* to wait for orders from his owners, and not with intent to unlade his ship ; yet I should doubt the right to do that under this policy. If such a right existed, it must be found either in some usage of trade, or in a rational construction of the instrument itself. For the former of these there is no pretence ; and for the latter, I see no foundation. If such a right existed, I see no reason for restricting it to *New-York* only ; but after the ship had arrived at *Middletown,* the owners might have given new orders to return to *Philadelphia,* and from thence could direct her to return to *Boston ;* and on the same principles, the insured may keep the ship ranging from port to port indefinitely, in search of the best market, as their own convenience may dictate, and still hold the underwriters responsible for any loss which may happen.

There is but one of two constructions which can be put on this policy. One is, that the insured has the mere power of electing a port of discharge to which he is bound to proceed in the shortest and safest course. The other is, to hold the insurers responsible until the vessel is actually discharged of her cargo, or has begun to discharge, provided the insured acts reasonably for his own interest, and not wantonly or fraudulently. The latter of these would in my opinion increase the risk far beyond what could have been contemplated by the parties at the time of entering into the policy. If such a privilege is intended to be given to the insured, there should be an express clause to that effect, or it ought to appear, from the nature of the voyage, and the situation of the parties, taken in connexion with other parts of the policy, that such was their intention. But in the present case, the construction I oppose derives no aid from any of these sources.

Had this been the case of an outward bound voyage, with a cargo from the nature of it evidently seeking an uncertain market, in an unknown country, there would be some room to doubt whether it was not their intention to authorise the insured to range from port to port in search of a market ; but the present was a homeward bound voyage, with the owner in this country, who must of course have been well

*New-Haven,* November, 1814.

King *v.* The Middletown Insurance Company.

King
v.
The
Middletown
Insurance
Company.

acquainted with the state of the markets before the ship sailed ; and besides, the cargo was of a kind which, of all others, is perhaps the least subject to any great fluctuation in the markets, in this country.

But it is said, that if the construction which I put upon this policy be correct, there is no difference between a port of *arrival* and port of *discharge*, whereas a difference must have been intended. I am far from being certain, however, that any difference was intended. I find the terms port of *discharge*, port of *delivery*, port of *destination*, and port of *arrival*, all used in the books indiscriminately to express the same idea. But it is not necessary for me to insist that these terms are synonymous, because I do not say, that under a policy of the kind in question, it is necessary for the ship to discharge her cargo in every case at her port of arrival. The port of arrival may be in the direct course to the port which is intended as the port of discharge. In that case, she might proceed to her port of discharge without deviation, and of course without discharging the policy.

It has been said, however, to be reasonable, that the insured should be allowed to go into one port, and there enquire as to the state of the markets, or to enable the master to communicate with his owners, before an election is made at what port to unlade the ship. In answer to this argument, I will only say, that when about to put a construction on a written instrument, I cannot permit myself to speculate on what would or would not have been reasonable and useful provisions to have been introduced into it ; my only business is with what I find in it ; and by the best attention which I have been able to bestow on this subject, I have not discovered any intention to give such a privilege, which would indeed be of great importance to the insured, but would increase the risk of the underwriters in a degree equally important and interesting to them.

In the argument of this case, much stress has been laid on the case of *Coolidge & al.* v. *Gray*, reported in 8 *Mass. Rep.* 527. That case appears to me to differ from the present in several particulars of considerable importance ; but whether it can be distinguished from the present in point of principle, I do not deem it necessary to enquire, because it is agreed not to be of any binding authority in this court. And though I admit, that it has been decided by a court of high respecta-

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

bility, yet I feel myself constrained to say, if it must be admitted to be similar in principle to the present, that it is not supported by any usage of trade, or by a single decision either in the *English* courts, or any of the courts of our sister states, and stands opposed to the general principles of law as applicable to the construction of written instruments.

It appears to me, also, that the court below were incorrect in deciding, that because the ship was stranded, and in imminent danger of being lost, the insured had a right to abandon her to the insurers. There is no right to abandon, unless there is a total loss; but to constitute a total loss in point of law, it is not necessary that the ship should be entirely destroyed. If a ship becomes a wreck, it is in point of law a total loss; and it becomes a wreck when by means of damage at sea the repairs will cost more than one half her value. So a loss of the voyage is a total loss, although the ship may have received but a slight injury. But the mere stranding of a ship has never been held to be a total loss, though it may afterwards become a wreck by means of another storm, or otherwise; and if so, it then becomes a total loss; or it may remain stranded so long that the voyage is thereby lost; and if so, then it becomes a total loss by that means. In the case under consideration, the ship was stranded on the rocks, and in imminent danger of being lost when the abandonment was made. Does this constitute a total loss so as to give the right to abandon? The mere stranding, we have seen, does not. Does the danger she was in of being lost alter the case? I do not see any difference in this respect between the danger a ship is in of being lost by stranding, and danger by a storm, or by an enemy, provided it is equal in degree; but these, however extreme, have never been holden to constitute a total loss. They are mere perils; and however imminent the danger, a total loss may never happen. The stranded ship may drift off without becoming a wreck; the storm may abate; and the enemy may not succeed. At any rate, the insured should wait till the loss happens, unless by waiting the voyage is lost. Suppose a ship in a storm drifts on rocks near the shore, and for the moment is in imminent danger of being lost; the insured standing on the shore instantly abandons her to the insurers; and the next gust of wind, in five minutes afterwards, drifts her off, and she proceeds on her voyage, not having received any essential

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

injury; would there be a total loss at the time of the abandonment? It appears to me that this would not be contended for; and I see no difference in point of principle between the cases where she drifts off soon enough to proceed on her voyage, provided the damage is not so great but that she can be easily repaired. In the present case, the vessel was got off the rocks by the master in a few days after the abandonment, in a situation to be easily repaired with an expense of but a small part of her value. For the expense of getting her off the rocks and repairs the insurers ought to be liable; but it is too much to subject them to pay for the ship.

But it appears in the present case, that the insurers, on being notified of the abandonment, refused to advance money to get her off from the rocks, on the ground that they considered the voyage to have terminated in *New-York.* And it is said in argument, that where a ship is stranded, and in extreme hazard of being lost, the insured is not bound to expend his own money in attempting to get her off; because if he fails, and the ship is lost, he can recover for no more than a total loss on the policy; and of course, must lose the expense. If, therefore, the insurers in such case, will not advance money to defray the expense on being notified, the insured may immediately abandon. If then the insurers had advanced money to defray the expense of getting the ship off the rocks, it would not have been a total loss, and *a fortiori* it is not a total loss where she gets off without expense; or where the master gets her off with a small expense, and she is in a condition to proceed on her voyage.

The law has been rightly stated, that the insured is not obliged to expend his own money in getting off a ship which is stranded, and in extreme hazard of being lost. But it does not follow, that because the insurers refuse to advance money, the insured may immediately abandon. The right to abandon must still depend on the question whether there is a *total loss;* which may never be the case, though both parties refuse to advance money.

In a case of this kind the insured is in no difficulty; he is not bound to expend his own money; and if the insurers will not advance it, on being notified, the insured may abandon whenever the ship becomes a wreck, or whenever it remains stranded so long that the voyage is lost; because in either of these cases, there will be a total loss. But where

the ship immediately drifts off without expense, and in good condition to proceed on her voyage ; or is in a condition to be easily repaired, and the voyage is not lost ; the refusal to advance money will not turn it into a total loss. The case of *Wood* v. *The Lincoln and Kennebeck Insurance Company,* decided by the Supreme Court in *Massachusetts,* and reported in the sixth volume of *Massachusetts* Reports, page 479, was decided on the same principles which govern this case. In that case, it appeared that the vessel was stranded, and in as much hazard of being lost when the abandonment was made as the ship in this case was at the time of abandonment. In that case as well as this, the event proved it not to be a total loss, however great the danger might be at the time of abandonment. And both that case and this must turn upon the question whether there was in point of law a total loss, at the time of abandonment ; because if so, it was a vested right, and changed the property. The court, however, in that case, did not subject the insurers for a total loss.

Further, in that case, after the abandonment the insurers got off the ship at their own expense ; in the present case, the master got her off, and he being agent to the insurers after the abandonment, it is the same thing in point of law as though they had done it themselves.

Chief Justice *Parsons* indeed says, that where it may be doubtful whether the attempt to get off the ship will succeed, while the expense is certain, if the insurer on having notice will not engage to pay the expense of the attempt, and also repair the vessel if the attempt should succeed, the assured may abandon ; but he proceeds on the ground that the getting off the ship by the insurers is tantamount to their engagement to get her off, and equally efficacious to prevent the stranding from being a total loss, though done after the abandonment. In the present case, then, if the principle advanced by him be correct, the master's getting off the ship in behalf of the underwriters will have the same effect as though she had been got off by them, and the legal effect of the abandonment being in this way destroyed, the master becomes, again, the agent of the insured.

But I cannot conceive that these are the real principles which governed that case ; because it contradicts the whole current of authorities to permit any subsequent transactions

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

*New-Haven,*
November,
1814.

King
*v.*
The
Middletown
Insurance
Company.

to remove the legal effect of an abandonment rightly made at the time, except an agreement of the parties either express or implied. I must conclude, therefore, that the real principles which governed that case were, that the subsequent transactions showed that there was not a total loss at the time of abandonment. Nor can I admit, that the principle is a correct one, that a refusal of the insurer to advance money, or undertake to defray the expense, will in any case turn a partial loss into a total loss. I find no adjudged case to support such a position. In the case of *Hamilton* v. *Mendes,* 2 *Burr.* 1198. there had been a clear total loss by a capture of the ship, and the ship having been re-captured before any abandonment or action brought, and the insurers having undertaken to defray all the expense, the question was, whether the insured could then avail himself of such total loss. It had been argued, that he could, because the re-captor had a right to demand a sale for the salvage, and thus prevent any farther prosecution of the voyage. But this Lord *Mansfield* said was not so ; but on paying the salvage, the owner was entitled to restitution. And as the insurer had undertaken to pay this, the owner was placed in the same situation as though the loss had not happened ; and although there had been a damnification by a total loss, yet the insurance was a contract of indemnity, and all damages had been removed before action brought. But Lord *Mansfield* remarks, that " It does not necessarily follow, that because there is a re-capture, therefore the loss ceases to be total. If the voyage is absolutely lost, or not worth pursuing ; if the salvage is very high ; if farther expense is necessary ; if the insurer will not in all events engage to pay that expense, though it should exceed the value, or fail of success ; under these, and like circumstances, the insured may disentangle himself and abandon, notwithstanding there has been a re-capture."

Now these principles appear to me perfectly correct, and are supported by many analogous cases ; but they are very different from those assumed by Chief Justice *Parsons,* and by the court below in the present case. In the one case, there had been confessedly a total loss, and the question was how the effect of that could be removed ; and in the other, there is no total loss, and the question is how a partial loss can be turned into a total one. The former of these can be done in many cases ; but the latter can be done in no case.

There has not, then, been a total loss of this ship at the time of abandonment, or at any other time ; and if the object of the insured is a fair indemnity for the damage sustained, he has a full and perfect remedy by considering this a partial loss. If his object is not an indemnity, but the sale of his ship at a high price, it is unjust.

There have been in argument before this court some remarks on the subject of the *voyage* being lost, by means of this stranding. But as the court below did not decide this to be a total loss on that ground, but expressly on the ground of the stranding of the ship, her being in great danger of being lost, and the refusal of the insurers to advance money, I need make no remarks on that ground ; though it seems that a considerable portion of the cargo was taken out of the vessel by the insured and put into lighters for the purpose of performing the remainder of the voyage before the accident happened.

New trial to be granted.